Argued March 4, petition allowed June 19, petition for
rehearing denied September 4, 1963

IN THE MATTER OF THE APPLICATION OF
# BERNARD JOLLES
FOR EXAMINATION AND ADMISSION TO PRACTICE LAW

383 P. 2d 388

*R. W. Nahstoll,* Portland, argued the cause for petitioner. With him on the briefs were Allan Hart and Harlow F. Lenon, Portland.

*Hugh L. Biggs* and *Howard I. Bobbitt,* Portland, argued the cause and filed a brief for Oregon State Bar.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

O'CONNELL, J.

Bernard Jolles, having passed the bar examination has made application for admission to the Oregon State Bar. The Board of Bar Examiners has recommended that his application be denied on the ground that Jolles failed to establish that he is a person of good moral character which is a requisite for admission. ORS 9.220 (2). The Board's recommendation is based upon the following grounds:

"1. Membership of Mr. Jolles in the Communist Party from 1949 to 1957 and the nature of his activities while a member of the party.

"2. His refusal to answer pertinent questions in his interview before the Board.

"3. Admitted falsification of application for dock passes to the Waterfront Commission of New York and the U. S. Coast Guard.

"4. Failure to disclose, in the Northwestern College of Law application, his past Communist affiliation.

"5. Failure to provide the Board with any evidence, other than his own testimony of disassociation from the Communist Party."

The facts are as follows:[1]

*"Applicant's Background*

"Jolles is [34] years old. He was born and raised in New York City, educated in the public schools of New York and graduated from high school in 1946. His parents had immigrated from the Poland-Austria area of Eastern Europe. Through his parents and special schooling he was exposed at an early age to

[1] The Board's summary of the facts is adopted with minor changes.

certain socialistic and so-called left-wing principles and beliefs. Neither his parents nor any other members of his immediate family were Communist Party members, and his parents opposed his joining the Communist Party (hereinafter also referred to as the 'Party'). * * * [His] father was unemployed during part of the early depression years. In the latter part of the 1930's * * * [his] father opened a lunch-counter business which he operated successfully for many years.

"Jolles was honorably discharged from the Navy after serving 22 months in 1946 and 1947. He attended New York University from 1948-51 from which he received a bachelor's degree in 1951.

"While in school, Jolles worked at a variety of part-time and summer-time jobs and from time-to-time assisted his father in operating the lunch stand. Following graduation from New York University in 1951 he was employed as an assistant buyer in the New York garment industry until 1953 when, for reasons hereinafter explained, he went to work on the water-front as a longshoreman.

"He was a longshoreman until 1957 when he came to Oregon. * * * [He worked] first at Meier & Frank's [department store] for a short period before entering the employ of the Portland law firm of Anderson, Franklin, Jones & Olsen.

### *"Communist Party Affiliation*

"Jolles joined the Communist Party in 1949. * * * [At that time he was 21 years of age and a] student at New York University. He was a member of two different neighborhood clubs * * * [referred to in the Party as] 'cells' * * *. [The first cell was an adult club. The second was a youth group of which

Jolles became chairman. He was also a member of a Communist-front organization designed to lure other young people into the Communist Party.]

"In 1953, he voluntarily left employment in the garment industry to become a longshoreman on the New York waterfront in order further to assist the Party. He gives as his reason for the change of employment his belief that if any change toward socialism was to be made in our society, it would be brought about by the industrial worker in the basic industries. He wanted to further the cause of the workers and the Party by being directly identified with them.

"Financial betterment, either immediately or in the future, was not one of Jolles' purposes in going on the waterfront.

"In 1953 he became affiliated with a Party waterfront club of about four members which was part of a larger group of * * * [less than 20] members known as the Waterfront Section Committee. He became Chairman of his club in 1954, and ultimately became Organizational Secretary * * * of the Section, which had Party responsibility for [propagandizing] approximately 10,000 longshoremen who worked on the Brooklyn waterfront. He also worked and met with regional organizers and officials, although he held no regional position or office (the region involved included the entire New York waterfront [and was not in a policy-making position]).

"Jolles' activities while a Party member included * * * [attending Party] meetings, generally weekly; participating in support of candidates for public office endorsed by the Party; participating in demonstrations * * * [in accordance with] Party orders or directions including picketing of the White House in connection with the Rosenberg convictions; dissemi-

nation of Party-prepared and sponsored literature and leaflets; \* \* \* [the writing of] articles in, and otherwise assisting in preparation and circulation of, The Dockers' News, a Party waterfront publication; attending the Party-supported Thomas Jefferson School of Social Studies for about a year, taking courses in [Marxist] economic theory; and attempting to persuade others to join the Party or to support its causes. His social life was also centered around his Party associates.

"Jolles admitted an understanding and awareness of Party philosophy, principles and aims. He testified that the Party's position in the United States with regard to force and violence, as he understood it and the position to which he subscribed, was that resort to force would be justified and used if a capitalistic minority resisted the efforts and frustrated the will of the majority to establish socialism.

"\* \* \* Jolles \* \* \* conceal[ed] his membership as a Party member from those who were not Party members. For example, he used the name 'Eddie' at Party [meetings] to minimize the risk of identification. Party meetings were secret and held in private homes. When he went on the waterfront in 1953, he ceased subscribing to Communist literature to further reduce the possibility of being exposed as a Communist or identified with the movement. During his eight active years of Party affiliation, the Party was not an open political party in New York. Also, during this period the United States was involved in the Berlin blockade\* and Korean War, and the Russian intervention in Hungary took place.

---

\* "His membership covered a part of the period of the blockade. The Berlin blockade and resulting airlift commenced November 6, 1948 and terminated October 4, 1949. Jolles stated that he joined the party in the fall of 1949."

"Jolles testified that he openly disassociated himself with and resigned from the Party in May of 1957 at a meeting of the Section of which he was Organizational Secretary. He testified that in the preceding year he had become disillusioned about the Party and its objectives, and had re-examined the Party position and his own beliefs. He cited Premier Khrushchev's speech denouncing Stalin along with the Russian intervention in Hungary, as the incidents which motivated his personal re-examination of the Party and ultimate disassociation. His wife testified that his motivating purposes for disassociation were [largely] economic, domestic and personal. His Party affiliation, and especially his waterfront employment, had caused family difficulties because of the economic sacrifice imposed and the time required away from home.

"* * * [Jolles was] requested * * * by counsel for the Bar and by the Board members * * * to disclose the names of any person familiar from personal knowledge with Jolles' activities while in the Party or who could confirm from personal knowledge that he did in fact openly resign from the Party in May of 1957. Jolles refused.

"He recognized that the Board had no other direct way of corroborating his testimony as to some of his Party activities or as to his disassociation.

### "False or Incomplete Affidavits re New York Waterfront Employment

"Jolles admitted at the hearing in answer to a direct question that he knowingly and deliberately gave false or incomplete information under oath to the Waterfront Commission of New York Harbor and the United States Coast Guard regarding his membership

in the Communist Party [in order] to obtain access to the New York waterfront area to further the Party's cause.

"A dock pass from the Waterfront Commission and a Coast Guard permit were required by law in order to obtain such employment. The Coast Guard requirement was a part of the internal security program during the Korean War to keep Communists out of critical waterfront areas. False answers were necessary for Jolles to gain access to the waterfront.

"In his application to the Waterfront Commission, Jolles answered 'No' to the following question.

"'Do you knowingly or wilfully advocate the desirability of overthrowing or destroying the Government of the United States by force or violence, or are you a member of a group which advocates such desirability, knowing the purposes of such group include such advocacy?'

"The Coast Guard refused as a matter of policy to disclose any information to the Board, although authorized to do so by Jolles.* That Jolles' Coast Guard application was false in part was admitted and accepted by Jolles and his counsel throughout the February-March hearings.

### "Applications to Northwestern College of Law and Other Schools

"The application form for admission to Northwestern College of Law [\(]either before or immediately after his asserted disassociation from the Party and

---

* "Attempts by the Board in the summer of 1961 to obtain information regarding Jolles' Communist activities from records, if any, of the Federal Bureau of Investigation had also been unsuccessful."

while still living in New York City[)], includes the
following:

> " 'At the time of filing application for admission
> on examination to the Oregon State Bar, an appli-
> cant's moral character, past and present, is brought
> under careful surveillance by the Board of Bar
> Examiners. The Northwestern College of Law is
> equally interested in having in its student body only
> those whose character will stand the most rigid
> scrutiny. Any applicant for admission to the law
> school who is aware of circumstances in his life
> that might be considered a reflection on his char-
> acter, whether deemed justified or not, should set
> forth such circumstances fully on a separate sheet
> and attach the same to this application. Candor
> and truthfulness in this regard cannot be over-
> emphasized.'

"*  *  * [He admitted] that a full, complete and
candid response to the application would have required
disclosure of his Communist Party affiliation and ac-
tivities  *  *  *. He gave as his reasons  *  *  *
[for failing to make the disclosure his] desire to first
establish himself and make a new life without disclos-
ing the past  *  *  * [and his] desire not to make
a public record of his Party membership until or un-
less necessary to do so. He indicated his awareness
that disclosure would have to be made at such time as
he might seek admission to a state bar, but [he felt]
that it was always possible he would not complete
the law study  *  *  * [in which case] disclosure
[would not be]  *  *  * necessary. He also admitted
that his non-disclosure was due in part to fear that
he might not be admitted to law school [but that this
was not the basic consideration].

"Jolles also filed an application for admission to
Brooklyn Law School at approximately the same time

that he applied to Northwestern. His application had been destroyed by the school. The form of application used by the school contains the following question:

> " 'Has there been any incident in your life which might jeopardize the recommendation by the Committee on Character and Fitness for your admission to the Bar? . . . If so, briefly state the facts.'

Jolles testified that in his state of mind at that time, he probably answered the question 'no.'

"At the August, 1961 hearing, Jolles testified that, for the reasons summarized above in connection with his Northwestern application, he thought he falsified his application to New York University Law School filed in the spring of 1957 by denying or otherwise failing to disclose his past Party Membership. In fact, the New York University application contained no question or statement requiring disclosure. * * * * *

*"Disclosure of Party Affiliation*

"The first disclosure made by Jolles to anyone in Oregon of his past Party membership was to Robert E. Jones, one of the partners in the firm by whom he was employed. It was made in the spring of 1959, about a year and a half after he had accepted employment. * * * Jones, * * * testified that as he became better acquainted with Jolles, he became somewhat suspicious of his background and thought there was a good chance it included affiliation with Communism. The record continues:

> " 'So, I just—one Saturday morning we were sitting there in my office. No one else was around, and I said, 'Well, Bernie, were you ever a Communist, or are you—' I don't know how I worded it, but just cold turkey with him, and he looked like I had hit him in the face with a wet fish, and he

backed up and he kind of hunched his shoulders and he looked at me and said, 'I am not going to lie to you, Bob. I was . . . .'

"Jolles did not disclose his Party affiliation to representatives of Northwestern College of Law until confronted with the question in the spring of 1961 by Northwestern representatives who had learned of it from other sources. The disclosure to Northwestern came just before graduation and after he had been selected as valedictorian by his classmates. Under the circumstances, Jolles withdrew as valedictorian."

Jolles and his brother made efforts to locate former associates in the Communist Party to determine if they were prepared to consent to disclosure of their identity. They contacted four persons in New York and California. One, a cousin, forwarded an affidavit corroborating Jolles' testimony concerning his break with the party. The others refused to allow their names to be used. One sent in a letter explaining why his name should not be used. Jolles called him with his attorney listening to the conversation and the witness agreed to meet anonymously with the Board, but the Board declined to do so.

■ An applicant for admission to the bar of this state has the burden of proving that he is "a person of good moral character."[2] Six members of the Board were of the opinion that Jolles had not met this burden of proof; three members were of the opinion that he had.

The record clearly discloses misconduct which would

[2] ORS 9.220 provides that:

"An applicant for admission as attorney must apply to the Supreme Court and show that he or she:

"* * * * *

"(2) Is a person of good moral character, which may be proved by any evidence satisfactory to the court."

be sufficient to disqualify a person for membership in the Oregon State Bar. The falsification of the application for a dock pass would, in itself, be sufficient to justify disqualification for such membership. Jolles concedes as much. But he takes the position that his moral delinquency in this respect grew out of his acceptance of communist doctrine (which regards deception as an acceptable device for the attainment of communist ends) and that he is no longer subject to this deluding influence of communism.

It is not clear whether the same influence was at work when Jolles filed an application for admission to Northwestern College of Law in the spring of 1957. If at that time he had disassociated himself from the Communist Party (which seems to be the case), his failure to disclose his previous affiliation with the party would have to be explained upon a ground other than party loyalty. The application form did not make a direct inquiry as to one's conduct while holding membership in a subversive organization. It called for the disclosure of "any circumstance in his life that might be considered a reflection on his character, whether deemed justified or not." Although the question is somewhat ambiguous as to the type of past conduct one should disclose, Jolles candidly admitted that he regarded the question as possibly calling for a disclosure of his previous conduct in connection with the Communist Party. He explained his failure to disclose as follows:

"Q. Is it your feeling that there was nothing on the application to Northwestern that required you to make any disclosure of this at the time?

"A. Well, I probably felt that way because I wanted to feel that way. I suppose if I had analyzed it—there is a question there, I believe, to the effect,

'is there anything else you think we ought to know about?' and I think I answered that no, and possibly I should have said yes and disclosed the entire matter at that time. I didn't do that, and I just felt that in between the time of entering law school and being admitted to the Bar, too much could happen, so that if I didn't complete law school or I didn't go through with it, I just didn't want to make any public record of it at that time. That's the way I felt then."

"* * * * *

"* * * Didn't you well realize that you should, to completely answer that application correctly and honestly, make a disclosure of that background of Communist activity? Didn't you understand that when you completed that application?

"MR. JOLLES: Well, I can't say anything more than—I certainly was not confused or misunderstood or anything. I just felt that it was arguable whether I could in good conscience and honesty say yes or no to that question. At the time I had just left and I was still emotionally upset from the separation and shock, I guess you would call it, having everything that I thought was right and good turn out to be just smoke, I suppose. I mean, as I said before, I was certainly aware that it was a possibility and maybe even a probability that that's what they wanted, but I did not deliberately intend to falsify, nor do I feel I was falsifying at that time. I felt that if they wanted—there was certainly room for argument. This is all going on in my own—arguing with myself in terms of convincing myself, that if they wanted to know specifically that, that they could have asked it, and since they didn't—I agree it's weak, but I was grasping at straws, you might say.

"I just didn't—wasn't very anxious to reveal that, not for the purpose of falsifying but for the purpose of not having something publicly revealed for no purpose whatsoever in terms of—I might

have quit law school after a year or two or not made the grade or something like that.

"\* \* \* \* \*

"MR. BROPHY: You felt that to make a full disclosure you should actually set forth the nature of your Communist activities, didn't you?

"MR. JOLLES: Yes.

"MR. BROPHY: Now, the reason for not disclosing that was to some extent a combination of things, perhaps. Were you somewhat concerned about the possibility of not being admitted to Northwestern if you did make that disclosure?

"MR. JOLLES: Yes. That is another thing which I neglected to mention. I felt that there was this possibility, that perhaps this would result in my not even getting the chance to go through law school, and I just wanted to defer it until it became necessary to disclose it when I did."

Jolles further testified as follows:

"\* \* \* I understand that one could get the impression that my major reason for handling the Northwestern application as I did was to gain admission to law school. That is not correct, Mr. Biggs. I said that, and I said that was one of the reasons. I rather think it was an unimportant reason. For whatever difference it makes, my basic reason was the one which I indicated initially in that transcript, the effect that I wanted to give myself a chance to make an impression so that— so well, just take this proceeding here today. You have seen many people come in this room testifying, some testifying more strongly than others, but all at least expressing a willingness to come forward and testify, that at least so far as they were aware, I had behaved myself as one would with good moral character does."

Jolles voluntarily disclosed his past membership in the Communist Party when he made application to

take the bar examination, and later he disclosed the facts relating to filling out the application for a dock pass and the application for admission to Northwestern Law School. This lends support to Jolles' assertion that his failure to disclose his Communist Party affiliation in his law school application was a temporary expedient only and that he ultimately intended to reveal that fact if and when he made application for permission to take the Oregon State Bar examination.

Although his initial failure to disclose the information was improper, we feel that in light of his subsequent forthrightness in voluntarily disclosing the information there was no intent to practice deception in gaining admission to the bar.

In petitioning this court for the privilege to practice law in this state Jolles admits his past misconduct and pleads reformation of character. Reformation is a very difficult matter for a petitioner to prove and for us to judge because evidence of morality is not ordinarily adducible in positive form. Generally, proof must be made through the appraisal of those with whom the petitioner has worked and lived and who are in a position to see how he makes choices calling for moral decisions. The petitioner offered this proof through the testimony of the members of the law firm where he was employed and through the testimony of others who were acquainted with him. Each of his employers emphatically asserted that Jolles was a person of good moral character. Others who associated with him concurred in that appraisal.

Upon the basis of the evidence the minority of the Board concluded "that Jolles severed his Communist Party affiliation, is no longer a member of the Party and that he now rejects its principles and practices

and regrets his own wrongful actions. Based on this belief and since his detrimental conduct [and wrongful actions] were related to his Communist Party affiliation, they do not believe that such conduct or actions will be repeated. In the light of his conduct during the past five years and from the testimony of those who have associated with him during that period of time, the minority members of the Board feel that Jolles does now possess the requisite moral character for admission."

The majority of the Board found the evidence of Jolles' rehabilitation unconvincing. Further, they were of the opinion that Jolles' refusal to disclose the names of the persons with whom he was associated in the Communist Party so as to enable the Board to determine whether Jolles openly resigned from the party as he contended he did, was ground for adverse recommendation.

■ After a thorough examination of the record in this case we are of the opinion that there is sufficient evidence of Jolles' present good moral character to qualify him for membership in the Oregon State Bar. Our conclusion rests principally upon the testimony of his employers, who are three highly respected members of the bar. It would serve no good purpose to set out in detail their declarations of confidence in the integrity of Jolles and the grounds upon which it is based. We are further impressed by the forthrightness with which Jolles presented his case to the Board and to this court. Jolles' refusal to disclose the names of his former colleagues in the Communist Party may have obstructed the Board's efforts to verify Jolles' assertion that he openly resigned from the party. The likelihood of establishing the truth or falsity of his assertion by interviewing his former associates is not

very great. But assuming that something of value might have been disclosed through such interviews, we believe that Jolles' refusal to disclose the names of his former colleagues for fear that it would harm them was sincere and that it should not be used as a basis for denying him the privilege of practicing law in Oregon. This sincerity is pointed up by his efforts to obtain permission to use their names and in lieu thereof to arrange anonymous interviews with the Board.

We are convinced that Jolles is free from the Communist influences which distorted his moral judgment and that he is now a person of good moral character. Having passed the bar examination he is eligible for admission to the Oregon State Bar upon filing the prescribed oath.

PERRY, J., dissenting.

After serious consideration of the personal loss, and perhaps personal injustice, which could result to the petitioner from a denial of his application, and my duties as a member of this court intrusted in such matters with the welfare of the public and the profession, I am compelled to disagree with the conclusion reached by the majority.

The fact that petitioner was at one time a card-carrying member of the Communist party carries no weight in my thinking, except insofar as his membership therein at the time of joining and his actions in connection therewith reflect upon his present moral character.

The majority point out that the petitioner is equipped with excellent mental faculties, therefore no reason seems to exist for any belief that he did not know the moral import of his actions. In fact, with

relation to a falsification to the Coast Guard, to which I will refer later, he stated, "Yes, I felt I had a code of morals even while I was in the Party. However, I don't mean to suggest that it was consistent with that personal code of morals to falsify Coast Guard affidavit."

As stated by the majority, petitioner entered the United States Navy in 1946. It is common knowledge that one who enters the armed forces of this country takes an oath to support the Constitution of the United States, yet within two years after his discharge from the Navy he joined an organization whose reputed purpose was the overthrow of that Constitution. He must have known, with the publicity existing at that time, that his membership in the organization was inimicable to respect for the laws of this country and the rights of the people of this country as guaranteed by that Constitution. His efforts to conceal his connection with the organization at that time clearly disclose his actions would not stand the light of truth.

That petitioner once believed in the doctrine of rule by might instead of rule by law is found in his statement that he believed force was justified if necessary to achieve a political goal.

The petitioner's greatest lack of moral character is disclosed in the revelation of a deliberate falsehood perpetrated against this country when at a time this country, as it still is, was engaged in what has been termed a cold war with Russia and Communist China.

For security purposes applicants for longshoreman work in New York harbor were required to make application to the Waterfront Commission of that harbor. In this application was this question, as set out in the majority opinion: "Do you knowingly or wilfully advocate the desirability of overthrowing or destroy-

ing the Government of the United States by force or violence, or are you a member of a group which advocates such desirability, knowing the purposes of such group include such advocacy?", the petitioner answered in the negative.

The majority opinion does not comment upon this falsehood. In my opinion this is an act which clearly shows a lack of moral stamina.

The petitioner admitted he knew his action was wrong, yet knowing this he did the act, and salved his own conscience with the thought that others have before acted falsely. He states he did no act of sabotage, but this very act was an attempt to sabotage his government's lawful purpose.

The practice of law is a privilege—not a right. *In re Weinstein,* 150 Or 1, 6, 42 P2d 744; *Re Application of Jesse Crum,* 103 Or 296, 204 P 948. A lawyer is a trusted officer of the courts, and into his hands are intrusted the client's innermost confidences, his valued possessions, and on occasion, even his life itself.

Good moral character is difficult of exact definition, but for the lawyer its elements must include simple honesty, fairness, respect for the rights of others, and the laws of the state and nation. In my opinion moral character is disclosed in past deeds, not in protestations of reform when a desired purpose is to be gained.

The entire burden of the majority's opinion is that the petitioner has reformed. In what manner, the opinion is unclear. If they mean he has changed his views as to the values of communism as opposed to democracy, that is well and good, but the real question is whether his moral fiber has changed. He stated he had moral values above those taught by the Communists, but his own conscious values did not prevail.

His own moral values did not stand the test in the past, and since then, have not been tested. Can it then be said, since he has abandoned his communistic views his moral fiber is stronger than before? Evidence which supplies merely a belief of reformation of moral views deserves consideration, but it does not, in my opinion, meet the burden of establishing proof of good moral character.

The fact that one guilty of misconduct which would clearly disqualify him for admission to the Bar may establish that he has subsequently had a clean record for several years would not necessarily justify this court in concluding that his moral fiber would not again break under sufficient temptation. So, in the matter before us, can we say without doubt in our minds that the petitioner will not, if endowed with fervor for a cause, violate his trust as a lawyer to uphold the laws of this state and nation, or give false testimony, though knowing it morally wrong?

When petitioner applied for admission to law school he continued to conceal his unlawful communist activities. In fact, petitioner did not at any time voluntarily make a clean breast of his hidden activities. It was not until a member of the law firm by which petitioner was employed confronted him with a direct question which could not be evaded that petitioner finally disclosed that he had been a communist. This continued deception deepens the doubt as to petitioner's reformation, even in his beliefs.

I realize the efforts which the petitioner has put forth to prepare for the practice of law, and I have the greatest respect and admiration for the judgment of those who in anywise sponsored his cause, but to me it is clear the petitioner has failed to meet the

burden of showing good moral character for the practice of law, and this court ought not to permit the people of this state to be used as a proving ground for the purpose of determining whether or not there has been reformation.

For the reasons given, I dissent.

Mr. Chief Justice McALLISTER joins in this dissent.