SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| In the Matter of a Disbarred | ) | Arizona Supreme Court |
| Member of the State Bar of | ) | No. SB-04-0015-R |
| Arizona | ) | |
| | ) | Disciplinary Commission |
| RICHARD B. ARROTTA, | ) | No. 03-6005 |
| Attorney No. 003992 | ) | |
| | ) | |
| Applicant. | ) | **O P I N I O N** |
| _____ | ) | |

DISCIPLINARY ACTION
**Remanded to Hearing Officer**

_____

Thomas A. Zlaket                                                    Tucson
Attorney for Richard B. Arrotta

State Bar of Arizona                                               Phoenix
  by  Robert B. Van Wyck, Chief Bar Counsel
  and Denise M. Quinterri, Staff Bar Counsel
Attorneys for State Bar of Arizona

_____

M c G R E G O R, Vice Chief Justice

¶1      The issue in this case is whether Richard B. Arrotta, who was disbarred in 1995, has established that he should be readmitted to the Arizona State Bar.  We conclude that he has not established that he has been rehabilitated and deny his application for reinstatement.  We review this matter pursuant to Arizona Rule of the Supreme Court 65(b)(5).

**I.**

¶2      Arrotta was admitted to practice in Arizona in 1974. Over the next twenty years, he worked for the United States Army

as a Judge Advocate General, for the Pima County Attorney's Office as a deputy county attorney, and as a sole practitioner in private practice.

¶3    In 1990, Arrotta began representing clients in claims under the National Childhood Vaccine Act, 42 U.S.C. §§ 300aa-1 to 300aa-34 (1986) (Vaccine Act). The Vaccine Act established an administrative procedure for compensating children injured as a result of a required vaccination and provided reimbursement to attorneys for reasonable fees and costs incurred in representing a victim. *See* 42 U.S.C. § 300aa-15. The statute, however, expressly barred attorneys in Vaccine Act cases from charging clients any additional fees for services rendered. 42 U.S.C. § 300aa-15(e)(3).

¶4    The Valenzuelas, whose child had died as the result of a vaccination, retained Arrotta to bring an action under the Vaccine Act. Although Arrotta received approximately $39,000.00 in fees from the government for representing the Valenzuelas, he also withheld a one-third contingency fee from the family. In January 1993, when the State Bar inquired about Arrotta's fee practice in Vaccine Act cases, Arrotta falsely stated that he had never charged a contingency fee, or any other fee, to any of his thirty-five Vaccine Act clients.

¶5    Also in 1993, unrelated to his misconduct involving the Vaccine Act cases, Arrotta met Philip N. DePalma, a claims

2

adjuster in Arizona's risk management section. DePalma asked Arrotta to represent his brother in a case involving his brother's termination from his job. Arrotta agreed. Shortly thereafter, DePalma asked Arrotta if he would represent a claimant whom DePalma believed had a significant medical malpractice claim against the state. Arrotta consented, and DePalma subsequently informed Arrotta of other claimants and facilitated Arrotta's solicitation of those cases. While DePalma initially made no mention of payments due him, months later DePalma asked Arrotta to give him referral fees for the cases he had sent to Arrotta. Arrotta agreed and proceeded to make secret payments, which eventually exceeded $400,000.00, to DePalma as DePalma continued to provide him confidential information concerning claims against the State of Arizona. This information revealed the identities of persons with potential liability claims against the state, as well as confidential information related to the claims. Relying on this information, Arrotta solicited potential claimants as clients and ultimately received legal fees in excess of $1.1 million for those cases. At no time did Arrotta or DePalma disclose these payments to the state. Arrotta has always maintained that all of the cases were meritorious and involved clear and provable negligence by the state.

¶6      When a federal investigation into these matters began, Arrotta almost immediately gave a full confession to the Assistant United States Attorney, without seeking any concessions in return. Shortly thereafter, in September 1995, Arrotta pled guilty in the United States District Court for the District of Arizona to two counts of mail fraud in violation of 18 U.S.C. § 1341, Class D felonies. Arrotta also pled guilty to bribery, a Class 4 felony, fraudulent schemes and practices, a Class 5 felony, and disclosure of confidential information, a Class 6 felony, in the Superior Court of Arizona for Maricopa County. After entering his guilty pleas, Arrotta consented to disbarment on September 21, 1995.

¶7      As a result of his criminal convictions, Arrotta served one year in a federal prison. Since his release from prison, Arrotta has worked as a paralegal/legal assistant for several attorneys in Tucson and Phoenix and currently works full-time as a legal assistant for the Hollingsworth Law Firm, P.C. in Tucson. Although Arizona Rule of the Supreme Court 64(b) permits a disbarred lawyer to apply for reinstatement after five years,[1] Arrotta waited almost eight years to submit his application.

---

[1] Rule 64(b) provides:

> A lawyer who has been disbarred may apply for reinstatement, as set forth in Rule 65, not sooner

¶8    In his application, Arrotta presented dozens of letters in support of his reinstatement from lawyers, employers, family members, judges, clergy, and members of his church. In addition, during his reinstatement hearing, Arrotta offered testimony from the attorney responsible for prosecuting him in federal court, the former pastor of his church, a lawyer and former employer, and Arrotta's current employer, Louis Hollingsworth. Arrotta also testified.

¶9    At the outset of the hearing, the State Bar indicated that it would reserve its opinion as to whether Arrotta should be reinstated until the close of evidence. At the close of the hearing, the State Bar recommended reinstatement. Based on the evidence presented and the position of the State Bar, the Hearing Officer found that Arrotta has been rehabilitated and recommended that Arrotta be reinstated to the practice of law in Arizona; that he be placed on probation for one year, subject to various terms; and that he pay the costs and expenses incurred in connection with his application for reinstatement. Pursuant to Arizona Rule of the Supreme Court 65, the Disciplinary

_____

    than ninety (90) days prior to the fifth anniversary
    of the effective date of the disbarment, but may not
    be reinstated until after the fifth anniversary of the
    effective date of the disbarment.

Ariz. R. Sup. Ct. 64(b).

5

Commission reviewed the Hearing Officer's Report[2] and accepted the Hearing Officer's recommendation of reinstatement, one year of probation, and costs of the proceedings.

¶10     Two members of the Disciplinary Commission dissented, finding Arrotta unworthy of reinstatement. The dissent took particular note of the fact that, during oral argument, Arrotta's counsel opined that an individual applying for initial admission to the Arizona State Bar probably would not be admitted with a criminal record similar to that of Arrotta. The dissent found it troubling that "the bar apparently is set lower for readmission than for initial admission. . . . [I]t would seem that the bar for readmission should be if anything *higher*." Moreover, because Arrotta made no reference in his application to any kind of "rehabilitation, counseling, therapy or any other modality to try to understand why he would commit such dishonest acts," the dissent concluded that Arrotta had not shown rehabilitation.

---

[2] Rule 65(b)(4) provides:

> The commission shall promptly review the report of the hearing officer and the record, and will file with the court its own report containing findings of fact and recommendation concerning reinstatement, together with the record. The commission shall serve a copy of the report on the parties.

Ariz. R. Sup. Ct. 65(b)(4).

¶11    Arizona Rules of the Supreme Court 64 and 65 impose two basic requirements upon a disbarred lawyer who seeks reinstatement.  First, like initial applicants for admission, the disbarred applicant must establish that he "possesses the moral qualifications and knowledge of the law required for admission to practice law in this state."  Ariz. R. Sup. Ct. 64(a).  But the disbarred applicant must do more; he must additionally demonstrate "rehabilitation."  Ariz. R. Sup. Ct. 64(e).  The reason for requiring more of an applicant for reinstatement than of an applicant seeking his initial admission to the bar should be evident:  Knowing that we do not lightly disbar lawyers, we also know that the disbarred lawyer has already seriously violated the trust placed in him as an officer of the court and has revealed that, at least in some circumstances, he poses a threat to members of the public.  We must "'endeavor to make certain that [we do] not again put into the hands of an unworthy petitioner that almost unlimited opportunity to inflict wrongs upon society possessed by a practicing lawyer.'"  *In re Pier*, 561 N.W.2d 297, 300 (S.D. 1997) (quoting *In re Morrison*, 186 N.W. 556, 557 (1922)).

¶12    The burden of establishing rehabilitation falls on the applicant:  "The lawyer requesting reinstatement shall have the burden of demonstrating by clear and convincing evidence the

lawyer's rehabilitation, compliance with all applicable discipline orders and rules, fitness to practice, and competence." Ariz. R. Sup. Ct. 65(b)(2). Moreover, the more serious the misconduct that led to disbarment, the more difficult is the applicant's task in showing rehabilitation. *In re Robbins*, 172 Ariz. 255, 256, 836 P.2d 965, 966 (1992). On the other hand, the severity of a lawyer's misconduct in itself does not preclude reinstatement if the lawyer can establish that he has rehabilitated himself. *In re Peterson*, 108 Ariz. 255, 256-57, 495 P.2d 851, 852-53 (1972) ("Disbarment is not imposed as punishment, but rather to protect the public and the other members of the bar, and to deter other lawyers from the temptation to violate their ethics."). Nevertheless, "neither the fact that Applicant has been sufficiently sanctioned, nor the mere passage of time, is enough to warrant reinstatement. Applicant's burden is to show, by clear and convincing evidence, that he has been rehabilitated, that he is competent, and that he poses no further threat to members of the public." *Robbins*, 172 Ariz. at 256, 836 P.2d at 966. As we balance these factors, our primary responsibility remains at all times the protection of the public.

¶13     In evaluating an application for reinstatement, we consider four factors: "'the applicant's character and standing prior to the disbarment, the nature and character of the charge

8

for which he was disbarred, his conduct subsequent to the disbarment, and the time that has elapsed between the disbarment and the application for reinstatement.'" *Id*. (quoting *In re Spriggs*, 90 Ariz. 387, 388 n.1, 368 P.2d 456, 457 n.1 (1962)).[3]

¶14    We do not apply these factors mechanically. Rather, they help us determine whether the applicant has made the required showing. As we stated in *Robbins*, "the bottom line must always be whether the applicant has '*affirmatively shown that he has overcome those weaknesses that produced his earlier misconduct*,' *i.e.*, whether he has been rehabilitated." *Id*. (emphasis added)(quoting *In re Krogh*, 610 P.2d 1319, 1321 (Wash. 1980)); *see also In re King*, 177 Ariz. 358, 361, 868 P.2d 941, 944 (1994) (reinstating an attorney following a two-year suspension for misappropriating client funds, based on the hearing committee's finding that "the likelihood of Applicant again misappropriating funds is remote").

¶15    Courts in other jurisdictions similarly have stressed the fundamental importance of gauging whether an applicant has demonstrated that he has corrected whatever weaknesses led to his misconduct. *See*, *e.g.*, *In re Wiederholt*, 24 P.3d 1219, 1224 (Alaska 2001) ("The major consideration in reinstatement

---

[3] Our approach is consistent with that taken in other jurisdictions. *See*, *e.g.*, *In re Wiederholt*, 24 P.3d 1219, 1224-25 (Alaska 2001) (defining criteria to consider); *In re Stroh*,

9

proceedings is whether the disbarred attorney has shown that those weaknesses that produced the earlier misconduct have been corrected."); *In re Nash*, 855 P.2d 1112, 1116 (Or. 1993) ("We are entitled to have a reasonable assurance that the misconduct which brought the petitioner before this court once before will not reoccur." (quoting *In re Koken*, 329 P.2d 894, 895 (1958))); *In re Stroh*, 739 P.2d 690, 693 (Wash. 1987) ("The major consideration in reinstatement proceedings is whether the disbarred attorney has shown that those weaknesses which produced the earlier misconduct have been corrected."); *Comm. on Legal Ethics v. Pence*, 297 S.E.2d 843, 846 (W. Va. 1982) ("Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." (citation omitted)); *In re Brown*, 273 S.E.2d 567, 571 (W. Va. 1980) ("The concept of rehabilitation cannot be framed around a set of specific principles but will vary depending on the particular facts of a given case. Rehabilitation, ultimately, is demonstrated by a course of conduct that enables the Court to conclude there is little likelihood that after such rehabilitation is completed and the

_____

739 P.2d 690, 693 (Wash. 1987) (same); *In re Barton*, 329 A.2d 102, 104 (Md. 1974) (same).

10

applicant is readmitted to the practice of law he will engage in unprofessional conduct.").

¶16     We must retain a focus on whether an applicant has clearly and convincingly shown his rehabilitation, for we cannot fulfill our duty to protect the public unless, before granting reinstatement, we are confident that a lawyer will avoid the pitfalls that caused his earlier serious misconduct.

### III.

¶17     To show rehabilitation, an applicant must first establish by clear and convincing evidence that he has identified just what weaknesses caused the misconduct and then demonstrate that he has overcome those weaknesses. Arrotta has failed to make either of these showings.

### A.

¶18     We find nothing in the record that demonstrates by clear and convincing evidence that Arrotta understands or even has identified the *cause* of his misconduct. That failure sets him apart from applicants such as Robbins, whose misappropriation of client funds resulted from serious bouts of depression, *Robbins*, 172 Ariz. at 255, 836 P.2d at 965, and King, who misappropriated client funds because of his "precarious financial situation," *King*, 177 Ariz. at 360, 868 P.2d at 943.

11

¶19    Unlike those applicants, who recognized and then overcame their earlier weaknesses, Arrotta has stated that he does not understand why he acted as he did.  In a letter Arrotta wrote to the Honorable William D. Browning of the United States District Court in Tucson prior to his criminal sentencing, he said:  "I have asked myself repeatedly why I did the things to which I have now plead [sic] guilty.  I have no good, or valid, answer that can provide any justification."  More than eight years later, Arrotta's counsel stated to the Disciplinary Commission:

> I am not sure he knows why he did what he did back then.  I think there were a lot of pressures on him that were economic.  There were a lot of social pressures on him, and there was a lot of weakness involved.  And the combination of all three caused him to do what he did.

¶20    The only suggested explanation for Arrotta's misconduct involved his desire to attain material possessions. The attorney for the State Bar reasoned:  "I think that to put it bluntly, greed was the motive.  I can't think of any other motive for the conduct—the underlying conduct other than greed." Similarly, in a letter written to a friend from prison, Arrotta stated he believed that "putting the goal of financial brass rings and personal desires as primary" was the root of most of his mistakes and failures.  But Arrotta's desire for material possessions scarcely distinguishes him from many other lawyers

12

who, despite such desires, fulfill their obligations to their profession, their clients, and the public. Moreover, if simple greed caused Arrotta's misconduct, then he must present clear and convincing evidence that he has overcome that weakness; the record contains no such evidence.[4]

¶21     Nothing else in the record explains Arrotta's misconduct. The statements made by Arrotta's supporters in letters, both those made before his sentencing hearing and those made in support of his application for reinstatement, reflect that same lack of understanding as to Arrotta's reasons for acting as he did. Indeed, both sets of letters express disbelief that Arrotta allowed himself to commit such serious acts of misconduct. While these letters support Arrotta's application, they also illuminate its shortcomings. The writers' shock at Arrotta's behavior reflects the fact that they apparently did not perceive whatever weaknesses led to Arrotta's misconduct. Because they did not understand the reasons for the misconduct, none offered a basis for concluding that those reasons no longer exist. Lacking any understanding of the reasons Arrotta deviated from the course of conduct the writers

---

[4] To the extent that the record speaks at all to the issue of Arrotta's desire for material possessions, it does not support a conclusion that his desire for such possessions has changed. For instance, although Louis Hollingsworth testified that Arrotta is one of the nation's highest paid paralegals, Arrotta

expected, presumably these supporters would be equally surprised today if Arrotta committed further acts of misconduct.

¶22    Moreover, Arrotta offered no testimony from a mental health professional explaining his misconduct. Although we do not require professional treatment and testimony to gain readmission, we recognize that, in many instances, a counselor can assist an individual in understanding the reasons for his ethical violations and can help the person acquire tools needed to prevent future misconduct. An applicant who fails to present evidence that he has obtained such assistance must carry his burden by presenting some other basis to justify a finding of rehabilitation. When misconduct is as serious as that committed by Arrotta, persuasive evidence that a lawyer has identified and overcome prior weaknesses becomes even more essential.

¶23    Arrotta's approach to the issue of needing or obtaining professional assistance has not been consistent. Before the Disciplinary Commission and at oral argument, Arrotta argued that he did not need any medical or clinical counseling. Furthermore, as the State Bar investigator reported, Arrotta "did not attend any professional counseling with either a psychologist or psychiatrist [prior to his incarceration] because he felt it was unwarranted."

---

and his wife jointly contributed less than one percent of their joint income in 2002 to charity.

14

**¶24** In his brief to this court, however, Arrotta suggested that he in fact did receive counseling about the reasons for his misconduct. He claims first that "Mr. Aker has counseled [him] continuously since 1995, and even made trips to Nevada for that express purpose while [he] was serving his sentence of confinement." The record makes clear, however, that Aker provided emotional and spiritual support but did not counsel Arrotta about his crimes. Arrotta further states that he counseled with Randy Reynolds, Director of Renewal Counseling. The record reveals that, after his incarceration, Arrotta did visit with Randy Reynolds eight times over a six-month period. These sessions, however, pertained to Arrotta's marital problems with his second wife, rather than to his criminal conduct.[5]

**¶25** Arrotta's failure to identify the cause of his misconduct leaves the court unconvinced that the problems that led to his previous behavior have been identified and rectified— that is, that Arrotta has been rehabilitated. Absent such a showing, the Hearing Officer's finding that Arrotta has been rehabilitated lacks support and, therefore, is clearly erroneous. *See* Ariz. R. Sup. Ct. 59(b).

---

[5] Although Reynolds told the State Bar investigator that he did not counsel Arrotta concerning his criminal conduct, he also stated that he felt that Arrotta was unlikely to be recidivist and that he had been rehabilitated.

## B.

¶26    Because the record does not establish that Arrotta has identified the weaknesses that caused him to violate the trust of his clients and of the public, it necessarily follows that the record does not affirmatively show that Arrotta has overcome those weaknesses.  But even if we assume arguendo that, as Arrotta's counsel suggests, simple greed caused Arrotta's misconduct and that he now recognizes as much, the record before us does not demonstrate by clear and convincing evidence that he has overcome that weakness.

¶27    Arrotta primarily relies upon two arguments to establish his rehabilitation.  First, he accurately points out that he accepted full responsibility for his misconduct.  While admitting that he did not initially respond honestly to the State Bar's questions about his practices, he stresses that he approached law enforcement officials almost immediately after he learned that a federal investigation of his actions had begun. Against the advice of his attorneys, Arrotta gave a full statement to law enforcement officials, accepted full responsibility for his actions, and did so without requesting or expecting consideration in exchange for his cooperation. Indeed, the lawyer responsible for prosecuting Arrotta in federal court wrote a letter in support of Arrotta's reinstatement, emphasizing that Arrotta's candor with respect to

16

the federal investigation was unusual, and testified before the Hearing Officer that Arrotta began the rehabilitation process immediately.

¶28    Second, Arrotta points to the letters and testimony supporting his application for readmission, which attest both to his character and standing before disbarment and to his exemplary conduct subsequent to disbarment. A number of those witnesses expressed their opinion that Arrotta has been rehabilitated. For example, Louis Hollingsworth, Arrotta's current employer, wrote that Arrotta "began the rehabilitation process immediately upon being charged with the offense." Similarly, Dr. John B. Aker, former Pastor of Christ Church of Tucson, where Arrotta was an Elder, stated in his letter to the State Bar that Arrotta underwent "instantaneous" rehabilitation. Based on his character and standing prior to and subsequent to his disbarment, the speed with which he confessed his transgressions, and the assertions of other individuals that he "immediately" began rehabilitation or "instantaneously" became rehabilitated, Arrotta argues that he meets the requirements of Rule 64(e).

¶29    We do not discount the relevance of Arrotta's evidence. Accepting responsibility for past misdeeds constitutes an important element of rehabilitation. Similarly, we will carefully consider the opinions of those in the

17

community in determining whether rehabilitation has occurred, but neither of these factors can conclusively establish what our cases identify as the showing: clear and convincing evidence that the applicant has overcome the weaknesses that led to his misconduct. When a disbarred lawyer seeks readmission to the bar, particularly when disbarment resulted from conduct as egregious as Arrotta's, he must demonstrate more than that he has led a blameless and law-abiding life while disbarred. "Merely showing that [an individual] is now living and doing those things he . . . should have done throughout life, although necessary to prove rehabilitation," is not sufficient to meet the applicant's burden. *In re J.J.T.,* 761 So. 2d 1094, 1096 (Fla. 2000)(citation omitted). In addition, he must bring forth clear and convincing evidence showing the positive actions he has taken to overcome the weaknesses that led to his disbarment.

¶30     The required demonstration may come from any number of showings. For example, testimony from a mental health professional, while not always necessary, can often play a role in establishing that the lawyer should gain readmission. The Washington Supreme Court considered such a situation in *In re Rosellini*, 739 P.2d 658, 659 (Wash. 1987), in which the court granted reinstatement in a case factually similar to the current action. In *Rosellini*, the applicant had been disbarred for misuse of his client trust account and funds. *Id.* Like

18

Arrotta, Rosellini took steps following his disbarment to establish rehabilitation: he secured employment; demonstrated financial responsibility with regard to personal obligations since his disbarment, including making restitution; participated in community activities; and became involved in his church. *Id.* at 659, 661, 662. In addition, however, Rosellini sought professional psychiatric help to overcome the weaknesses that led to his disbarment and, at the time of his reapplication, was continuing to receive therapy. *Id.* at 659. Upon receiving his petition for reinstatement, the state bar appointed a special investigator who deposed Rosellini's psychiatrist, who could assure the court that it was unlikely Rosellini would repeat the conduct leading to his disbarment. *Id.* at 660.

¶32 In appropriate cases, the required "positive action" can be demonstrated by participation in community or charitable organizations, specialized instruction or education, counseling, or other similar evidence. But the burden is on the applicant to show more than that he has successfully lived by the rules of society after his misconduct. This record does not contain such a demonstration by clear and convincing evidence.

## IV.

¶33 For the foregoing reasons, we deny Arrotta's application for reinstatement. Our denial of the application normally would prevent Arrotta from filing another application

19

for reinstatement for one year. Ariz. R. Sup. Ct. 65(a)(4). In this instance, however, Arrotta's failure to present evidence sufficient to establish rehabilitation may have resulted from the failure of the State Bar to insist upon such evidence. Therefore, we suspend Rule 65(a)(4) and remand this matter to the Hearing Officer to take additional evidence, if such is or becomes available, that demonstrates both the cause of Arrotta's earlier misconduct and that he has taken adequate affirmative steps to overcome the weaknesses that led to his misconduct.

_____
Ruth V. McGregor, Vice Chief Justice


CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

20