Argued and submitted May 5, reinstatement denied August 5, 1993

In re the Matter of the Application of
Donald D. NASH
for Reinstatement as an Active Member
of the Oregon State Bar.
(SC S30865)

855 P2d 1112

Phillip M. Margolin, of Margolin & Margolin, Portland, argued the cause for Donald D. Nash. With him on the brief was Robert K. Udziela, of Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland.

Mary Anne Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. With her on the brief was Michael J. Gentry, Portland.

PER CURIAM

## PER CURIAM

Donald D. Nash (the applicant) was admitted to the Oregon State Bar (Bar) in 1972. He was disbarred in 1985, on his conviction of sodomy in the first degree, a Class A felony. ORS 163.405. *In re Nash*, 299 Or 310, 702 P2d 399 (1985).

In 1990, the applicant applied for reinstatement as an active member of the Oregon State Bar. The Board of Governors denied his application.

In 1991, the applicant filed a petition to review the Board of Governors' adverse recommendation. Bar Rule of Procedure (BR) 8.8.[1] This court referred the matter to the Disciplinary Board to inquire into the applicant's moral character and general fitness to practice law. The Bar filed a statement of objections to the application for reinstatement.

A Disciplinary Board trial panel held a hearing in 1991. The hearing was continued "so that the applicant could obtain a current, thorough evaluation from a psychologist, and the Bar could have its experts analyze the test results and report." Thereafter, the trial panel denied reinstatement. The applicant now seeks reversal of the trial panel's decision. This court reviews *de novo*. BR 10.6.[2] For the reasons that follow, we deny reinstatement.

The acts of sodomy resulting in the applicant's disbarment took place between 1982 and 1984. The victim

---

[1] BR 8.8 provides:

"Not later than 28 days after the Bar files an adverse recommendation regarding the applicant with the court, an applicant who desires to contest the Board's recommendation shall file with Disciplinary Counsel and the State Court Administrator a petition stating in substance that the applicant desires to have the case reviewed by the court. If the court considers it appropriate, it may refer the petition to the Disciplinary Board to inquire into the applicant's moral character and general fitness to practice law. Written notice shall be given by the State Court Administrator to Disciplinary Counsel and the applicant of such referral. The applicant's resignation, disbarment, suspension or inactive membership status shall remain in effect until final disposition of the petition by the court."

[2] BR 10.6 provides in part:

"The court shall consider each matter *de novo* upon the record and may adopt, modify or reject the decision of the trial panel or the BBX in whole or in part and thereupon enter an appropriate order."

*See* ORS 9.536(3) (same); ORS 9.539 (the Supreme Court shall review the decisions of the disciplinary board in reinstatement proceedings).

eventually reported the applicant's misconduct to her mother. The applicant pleaded guilty and was placed on five years' probation. In *In re Nash, supra,* 299 Or at 312, this court stated:

"The acts of sodomy involved a six-year-old child who was the daughter of a former client of the accused. We perceive no purpose to place upon the public record either the details of the sordid acts committed by the accused or a description of the prolonged and deep-rooted psychological problems from which the accused suffers."

The following rules govern the reinstatement procedure:

BR 8.1(b) provides in part:

"Each applicant [for reinstatement] under this rule must show that the applicant has good moral character and general fitness to practice law and that the resumption of the practice of law in this state by the applicant will not be detrimental to the administration of justice or the public interest."

BR 8.12 provides:

"An applicant for reinstatement to the practice of law in Oregon shall have the burden of establishing by clear and convincing evidence that the applicant has the requisite good moral character and general fitness to practice law and that the applicant's resumption of the practice of law in this state will not be detrimental to the administration of justice or the public interest."

"Clear and convincing evidence means that the truth of the facts asserted is highly probable." *In re Johnson,* 300 Or 52, 55, 707 P2d 573 (1985), quoting *Supove et al v. Densmoor et ux,* 225 Or 365, 372, 358 P2d 510 (1961). BR 8.13 provides:

"While an applicant for reinstatement has the ultimate burden of proof to establish good moral character and general fitness to practice law, the Bar shall initially have the burden of producing evidence in support of its position that the applicant should not be readmitted to the practice of law."

The only evidence presented to the trial panel came from four mental health professionals, who either had treated the applicant or had reviewed his history, and from his former probation officer. The applicant did not testify.

Evidence presented to the trial panel at the first hearing in 1991 showed that, after his arrest in 1984, the applicant consulted Dr. Weinstein, a psychiatrist, who treated him for about a year and a half for "depression." Weinstein testified that he believed that the applicant's sex crimes were a secondary manifestation of depression. Weinstein also testified that, because he did not find that the applicant was aroused during his sex acts with the child, he did not believe that the applicant suffered from pedophilia. Weinstein conceded, however, that he had not treated many pedophiles and that, in fact, he does not believe that psychotherapy is particularly helpful to pedophiles. He also conceded that, although he knew that the applicant was being treated concurrently by other mental health professionals, he had not compared notes with any other persons to determine whether any of them shared his opinion that the applicant suffered only from "depression," rather than from a sexual disorder. In December 1984, after he had been treating the applicant for less than six months, Weinstein wrote a letter to the court stating that he saw no reason why the applicant should not be permitted to resume the practice of law.

From mid-1984 to mid-1985, the applicant also received treatment from Mr. Jensen, a therapist. At the hearing, Jensen testified that, during the course of treatment, the applicant reduced his sexual responses to stimuli involving female children from high to low.

Dr. McGovern, a clinical psychologist, evaluated the applicant in 1984 and made treatment recommendations to the sentencing court.

The applicant's former probation officer testified that the applicant had been a very compliant probationer and that she had recommended early termination of his criminal probation.

At the close of the evidence, members of the trial panel expressed reservations about making a decision based on opinions about the applicant's mental health as of 1985. Accordingly, the hearing was recessed to allow the applicant to undergo a current psychological assessment.

In 1992, the trial panel reconvened and received new testimony from McGovern, who had reevaluated the applicant. The reevaluation included psychological, physiological, and polygraph examinations. McGovern opined that the applicant presently does not have a propensity to engage in deviant behavior. He recommended, however, that as a "safety valve" the applicant should intermittently meet with a psychiatrist to ensure that he is coping effectively with his depression.

Mr. Wolfe, another mental health professional, also reviewed the new data at the request of the Bar and gave an opinion. He cautioned that, if the applicant were reinstated to the Bar, certain restrictions on his practice would be appropriate in order to prevent the applicant from having contact with, or any power or authority over, children.

After reviewing the current data, Jensen opined that he had concerns about certain answers given by the applicant indicating that the applicant believed that his victim usually enjoyed the sex act and that he had not engaged in "grooming" to set up his victim.[3] Jensen also expressed concerns that the applicant had no relapse or prevention plan or new coping strategies should he experience difficulties in the future, that the applicant is currently married to someone 20 years his junior who is unlikely to be at his maturity level, and that the applicant's current level of sexual activity indicates that he still is overemphasizing sex. Jensen also felt that, if the applicant were reinstated, restrictions should be imposed on the applicant's practice, including: that his practice not involve female juveniles; that there be periodic checkups; and that his wife be involved in his ongoing rehabilitation.

Each of the mental health professionals concluded that the applicant had made significant progress in coping

---

[3] As used in the context of child sexual abuse, the term "grooming" has been described as

"a lot of gift giving, a lot of affection, praising, rewards, anything to make the individual more comfortable even to the extent of dealing with lots of people surrounding this particular person, just getting into a comfortable role; in other words, feeling comfortable and being close to an individual. Yes, they often establish some emotional dependency." *State v. Hansen*, 304 Or 169, 174, 743 P2d 157 (1987).

with his problems. None of them, however, had had any extensive contact with the applicant for over five years.

The trial panel found that the applicant has the required general fitness to practice law. Further, the panel concluded that the applicant meets the requirement of good moral character "at the present time." Finally, the panel concluded that the applicant had not established by clear and convincing evidence that his present good moral character will continue indefinitely into the future.[4] The trial panel concluded that the applicant's reinstatement would be detrimental to both the administration of justice and the public interest. The panel unanimously denied reinstatement.

Before this court, the applicant contends that the trial panel erred in imposing a requirement that he prove that his present good moral character will continue *in the future*. He argues that requiring an applicant to demonstrate that present good moral character will continue in the future violates the Due Process Clause of the Constitution of the United States.[5] The Bar responds that the applicant has not proved by clear and convincing evidence that he now has the requisite good moral character and that the trial panel erred in determining that the applicant presently has good moral character. The Bar stresses that, not only did the applicant not testify as to why this court should grant his application for reinstatement, but also that no person who presently lives or works with the applicant was called as a witness to provide the trial panel with a current appraisal of his moral character.[6] The Bar asks this court to deny reinstatement.

---

[4] The trial panel found:

"[A]ll of the experts testified at the second hearing that, although not probable, it is possible that the applicant might again commit sexual misconduct with a young girl in the future, particularly if he is faced with major stress."

[5] The Fourteenth Amendment provides in part:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"

[6] In reviewing the evidence provided by applicants for admission or reinstatement to the Bar, the court has considered such appraisals to be significant. *See, e.g.*, *In re Rowell*, 305 Or 584, 754 P2d 905 (1988) (letters of reference comparing the applicant's past and present character considered favorably); *In re Gimbel*, 271 Or 671, 674-75, 533 P2d 810 (1975) (testimony from community members as to the applicant's good moral character given weight); *In re Bernard Jolles*, 235 Or 262, 275, 383 P2d 388 (1963) ("Generally, proof [of good moral character] must be made through the appraisal of those with whom the petitioner has worked and lived and

The dispositive issue in this case is whether the applicant has established good moral character by clear and convincing evidence.[7] This court reviews all reinstatement matters *de novo* on the record and may adopt, modify, or reject the trial panel's decision. BR 10.2; BR 10.6.

Although reinstatement after a suspension is a relatively common occurrence, reinstatement after disbarment is uncommon in the legal profession, and not even possible in some jurisdictions. *See In re Warner W. Gregg*, 252 Or 174, 179, 448 P2d 547 (1968) ("If it appears likely that a disciplined lawyer may become rehabilitated within a few years and, therefore, should be permitted to resume the practice of law, suspension and not disbarment is the appropriate discipline."); *see also In re Koken*, 214 Or 357, 361, 329 P2d 894 (1958) (strong proof of good moral character is required to restore a disbarred lawyer to the Bar). In *In re Koken, supra,* this court addressed the issue of reinstatement after disbarment:

> "[The applicant] asserts that 'good moral character can only be defined as absence of proven conduct or acts which have been historically considered as manifestations of moral turpitude.' But we thin[k] that it is our duty to apply a stricter test of rehabilitation. It is possible that if we were to restore the petitioner to his former position in this bar he would

who are in a position to see how he makes choices calling for moral decisions."); *see also In re McKee*, 316 Or 114, 132, 849 P2d 509 (1993) (testimony from community members as to the accused's character and reputation taken into consideration as a mitigating factor in determining appropriate discipline); *In re Gortmaker*, 308 Or 482, 492-93, 782 P2d 421 (1989) (evidence from members of legal community expressing opinion that the applicant was not of good moral character considered, and reinstatement denied).

Additional indicia evidencing a change in an applicant's moral character are such things as participating in activities for the public good, statements of regret for past actions, letters of reference, religious affiliation, and other tangible evidence that provide this court with sufficient information to determine confidently that an applicant presently is of good moral character. *In re Rowell, supra*, 305 Or at 590; *In re Bevans*, 294 Or 248, 252, 655 P2d 573 (1982).

[7] In the context of admission to the Bar, ORS 9.220 provides that a lack of good moral character

> "may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

never again violate his public trust, but we would not discharge our obligation to the community if we should rest our decision in this case upon that conjecture. We are entitled to have a reasonable assurance that the misconduct which brought the petitioner before this court once before will not reoccur. We recognize that disbarment does not preclude reinstatement, but we believe that reinstatement should be allowed only in very exceptional cases." 214 Or at 360.

The applicant does not argue that his disbarment was erroneous. Instead, he argues that the Bar has not shown that he has engaged in new acts of misconduct after his disbarment in 1985. He argues further that the trial panel's finding that he presently has good moral character demonstrates that he has satisfied the criteria of BR 8.12.

■■ We find unacceptable the trial panel's distinction that the applicant has demonstrated present good moral character but that he has not demonstrated that his present good moral character will continue. Good moral character is one question, not two. The determination of good moral character is not based solely on an absence of present moral turpitude, but also on whether there is "a reasonable assurance that the misconduct which brought petitioner before this court once before will not reoccur." *In re Koken, supra,* 214 Or at 360.

■ The question before this court is not just whether the applicant has successfully passed a psychological test that indicates that he is not a present danger to the community.[8] The question is whether *in all respects* he is a person who possesses "the sense of ethical responsibility and the maturity of character to withstand the many temptations which [he] will confront in the practice of law." *In re Taylor,* 293 Or 285, 296, 647 P2d 462 (1982). The applicant has not presented the court with an answer to that question. Without such an answer, this court is left only with doubt as to the consequence of reinstatement. Such doubt must be resolved in favor of protection of the public. *Id.*

---

[8] The applicant has placed great emphasis on the fact that Dr. Weinstein did not diagnose his condition as pedophilia. That emphasis is misplaced. In this context, good moral character is a legal term of art that is not dependent on any particular medical diagnosis.

We consider it significant that the applicant did not testify at the hearing and, thus, the trial panel was denied the opportunity to assess his demeanor. Nor was the Bar able to test the bona fides of the applicant's claim of rehabilitation by cross-examination.

The cases on which the applicant relies for the proposition that the determination of moral character is frozen in time at the "present" do not discuss present, as opposed to future, good moral character. Rather, those cases focus on the distinction between present and past moral character. *See In re Jaffee*, 311 Or 159, 163, 806 P2d 685 (1991) (in admission proceeding, applicant had burden to demonstrate that his moral character had changed sufficiently that he should be admitted to the practice of law); *In re Rowell*, 305 Or 584, 588, 754 P2d 905 (1988) (same). Those cases do not stand for the proposition that, in making a determination whether an applicant possesses the requisite good moral character for reinstatement to the Bar, this court may not consider the potential for future misconduct.

The trial panel expressed doubts about whether the applicant could be trusted in the future. Clearly, the trial panel had serious reservations about whether the applicant would repeat his former criminal conduct. If someone cannot be trusted to refrain from sexually molesting children in the future, then, by definition, that person does not have good moral character *now*. On *de novo* review, we share the trial panel's concern that the applicant may engage in future misconduct.

The mental health professionals on whose testimony the applicant relies for his showing of good moral character did not provide this court with "reasonable assurance[s] that the misconduct which brought [the applicant] before this court once before will not reoccur." *In re Koken, supra*, 214 Or at 360. The applicant relied entirely on the testimony of those experts to establish his good moral character. After reviewing the most recent assessment, however, each of those professionals suggested that, in order to reduce the chance of the applicant's problems resurfacing, certain restrictions on the applicant's practice would be appropriate. It is clear that the professionals did not endorse those restrictions because of any specific distrust of the applicant but, rather, because such

limitations are considered wise in all cases involving the type of problem which resulted in the applicant's disbarment. All suggested some form of ongoing monitoring of the applicant's psychological health, and two of them advised limiting the applicant's practice in order to prevent him from coming into contact with children.

We also note that the applicant's previous problems apparently did not arise in the context of working with juvenile clients; his earlier victim was the child of an adult client. Restricting a lawyer to representing clients who have no children is not realistic; nor is the Bar in any position to supervise such limitations on a lawyer's practice. Moreover, it is not clear that the Rules of Procedure authorize any such permanent limitations or supervision. *See* BR 6.2 (authorizing imposition of probationary terms for suspended lawyers, not to exceed three years in duration). Aside from the practical difficulties in policing such limitations on a lawyer's practice, we are not persuaded of the wisdom of endorsing such limitations.

The applicant argues that denial of reinstatement denies him due process. The United States Supreme Court has held that a state "cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clauses of the Fourteenth Amendment." *Schware v. Board of Bar Examiners*, 353 US 232, 238, 77 S Ct 752, 1 L Ed 2d 796 (1957). We see no basis for any claim that the requirement of proof by clear and convincing evidence of good moral character for reinstatement after disbarment would violate the Due Process Clause of the federal constitution as a substantive matter.[9] The cases on which the applicant relies involve *procedural* due process. He does not explain, however, how he has been denied *procedural* due process, and we see no basis for so holding. We are unable to conclude that the applicant has been denied due process.

We hold that the applicant has not established by clear and convincing evidence that he possesses the good

---

[9] *See Koingsberg v. State Bar of California*, 366 US 36, 41, 81 S Ct 997, 6 L Ed 2d 105 (1961) (the requirement that applicant for admission to practice law must prove "good moral character" approved).

moral character requisite to reinstatement in the Oregon State Bar. Reinstatement, therefore, is denied.