Argued and submitted March 6, 1995, application for reinstatement granted
April 4, 1996

In the Matter of the Application of

# C. ANDERSON GRIFFITH,
*Applicant,*

for Reinstatement as an Active
Member of the Oregon State Bar.

(SC S33097)

913 P2d 695

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, argued the cause and filed the opening brief for the Oregon State Bar.

John D. Ryan, Portland, and C. Anderson Griffith, applicant *pro se*, argued the cause and filed the answering brief.

PER CURIAM

## PER CURIAM

Applicant, C. Anderson Griffith, has applied to this court to be reinstated as an active member of the Oregon State Bar (Bar) pursuant to Rule of Procedure (BR) 8.1. Applicant was admitted to practice in Oregon in 1968. He was disbarred by this court in December 1987 for misconduct in the course of business dealings and investments unrelated to his ordinary law practice. *In re Griffith*, 304 Or 575, 637-38, 748 P2d 86 (1987) (*Griffith I*). The Board of Governors of the Bar reviewed the application for reinstatement and, by a vote of seven to six, recommended to this court that reinstatement be denied. Pursuant to BR 8.8, this court referred the matter to a trial panel of the Disciplinary Board to inquire into applicant's moral character and general fitness to practice law. After a hearing, the trial panel unanimously recommended that this court reinstate applicant to the practice of law. We accept that recommendation and grant the application for reinstatement.

Before his disbarment, applicant and his law partner, Thomas E. Wolf, together with two nonlawyers, formed a mortgage company called First Northwest. That company specialized in short-term construction loans for real estate developers. Applicant and his partners borrowed capital from Columbia Pacific Bank, an entity for which Wolf was chief legal counsel and for which applicant provided some litigation-related representation. The partners of First Northwest also individually acquired shares in Columbia Pacific. Eventually, after a number of sham transactions involving First Northwest and unlawful stock sales, Columbia Pacific became insolvent, causing losses to a number of investors.[1] *Id.* at 578-82.

During that same time, applicant, Wolf, one of their First Northwest partners, and First Northwest also had formed a transportation company, called Trans-West, for the purpose of chartering aircraft. Applicant and Wolf served as counsel for that company. Wolf improperly signed the name

---

[1] This court's opinion in *In re Griffith*, 304 Or 575, 578-82, 748 P2d 86 (1987) (Griffith I), contains a detailed account of applicant's conduct leading up to the collapse of Columbia Pacific.

of the nonlawyer partner as the guarantor for the purchase price of an airplane. When Trans-West defaulted on the loan, applicant and Wolf advised the nonlawyer partner to convey real estate owned by him personally to Trans-West, which in turn mortgaged the real estate to the seller of the airplane as security for the debt. Trans-West subsequently defaulted again and the airplane was repossessed. The nonlawyer partner was required to pay $100,000 to secure the release of his real estate. *Id.* at 583, 632-34.

The Bar filed a formal complaint against applicant and Wolf.[2] In applicant's disbarment proceeding,[3] the trial panel found applicant guilty of four out of 39 causes of the complaint and selected disbarment as the appropriate sanction. Upon automatic *de novo* review, this court found applicant guilty of 10 out of 39 causes of the complaint and disbarred him. *Id.* at 577.

The material facts surrounding the events that led to applicant's disbarment were undisputed during the disbarment proceeding. However, during that proceeding, applicant argued that his involvement in First Northwest was not misconduct. Among other things, applicant argued that he was not conversant in the affairs of First Northwest, that "he was an 'intersection' or personal injury trial lawyer[,] and that he placed complete trust in Wolf who was [an] expert in the field of business and finance law and therefore he paid very little attention to the affairs of First Northwest." *Id.* at 618. This court rejected applicant's argument that he was a bystander to the fraudulent business dealings:

> "The record shows that Wolf was the quarterback who called the signals. It also shows that Griffith was not a third-string tackle who sat on the far end of the bench. He made at least two trips to meet with members of [a venture to which First Northwest had loaned money]. Griffith was an incorporator, shareholder, director and an officer of [another venture]. The Articles of Incorporation were forwarded to the State of Oregon over his signature. Later

---

[2] Wolf resigned from the Bar during the Bar's investigation into his alleged misconduct. *Griffith I*, 304 Or at 591.

[3] We refer to the disciplinary proceeding that ultimately led to applicant's disbarment as his "disbarment proceeding" throughout this opinion.

Griffith was responsible for firing a $3,000-per-month employe[e] of [the second venture] to save money and thereafter met periodically with the company's accountant to discuss [another venture]. Griffith's role was more like a first-string blocking back who played most of the time and who along with the quarterback was responsible for the win or loss." *Id.* at 618-19.

This court also determined that, although applicant cooperated with the Bar during his disciplinary proceeding, "on some occasions [his] answers were not truthful." *Id.* at 635. Ultimately, this court concluded:

"This is a sad case. A lawyer who had a fine reputation as a trial lawyer got outside his field. A combination of blind faith in a partner whom he considered to be his friend and an expert in the financial field plus plain old-fashioned greed 'did him in.' It may be that Wolf was [the] one who was selling the sack of rotten potatoes to the unsuspecting buyer, but Griffith had his foot on the scales. We have found him guilty of four causes involving dishonesty and six causes involving conflicts of interest."[4] *Id.* at 637-38.

After his disbarment, from 1988 until 1993, applicant worked as a paralegal and investigator for his former law firm. Since 1993, applicant has worked as a claims consultant to insurance companies.

In December 1992, five years after his disbarment, applicant filed an application for reinstatement to the Bar.[5]

---

[4] The court found that applicant had violated the following disciplinary rules: DR 1-102(A)(2) (1980) (circumventing a disciplinary rule through the actions of another); DR 1-102(A)(3), (4), and (6) (1980) (engaging in conduct involving moral turpitude; engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; engaging in conduct that adversely reflected upon his fitness to practice law) (multiple counts); DR 5-101(A) (1980) (accepting employment when his independent professional judgment was or reasonably may have been affected by his own financial, business, property, or personal interests) (multiple counts); DR 5-104(A) (1980) (entering into a business transaction with a client with differing interests and the client expected him to exercise his professional judgment for the client's protection) (multiple counts); and DR 5-105(A) (1980) (accepting employment when his exercise of his professional judgment in behalf of his client was or was likely to be adversely affected by the acceptance of the proffered employment) (multiple counts). *Griffith I*, 304 Or at 595-634.

[5] BR 6.1(d) (1992) provided that "[a] disbarred attorney may not apply for reinstatement until five years has elapsed from the effective date of his or her disbarment." The rules now make disbarment permanent for those matters in which disbarment is the sanction for a formal complaint filed on or after January 1, 1996. BR 6.1(e), 8.1(a)(iii) (effective January 1, 1996).

In May 1993, the Bar's Board of Governors investigated applicant's request and, by the close vote already noted, recommended that this court deny reinstatement. Applicant sought review of that recommendation. In October 1993, this court remanded the matter to a trial panel of the Disciplinary Board for an evidentiary hearing.

During the July 1994 reinstatement hearing before the trial panel,[6] applicant presented 303 letters and recommendations and called 24 witnesses to testify in support of his reinstatement. The evidence showed that roughly one-third of the $11 million in losses arising from the failure of Columbia Pacific was attributable to the activities of First Northwest. Applicant paid, settled, or compromised all the claims brought against him as a result of his involvement with First Northwest and Columbia Pacific. Applicant also settled with the Federal Deposit Insurance Corporation (FDIC) before the FDIC filed a claim against him and fully cooperated with the FDIC in its claims against other parties arising from the failure of Columbia Pacific. Applicant did not personally communicate with many of the individual investors who had suffered financial losses as a result of the failure of Columbia Pacific and did not personally try to determine whether any outstanding claims remained after completion of the FDIC settlement.

Applicant acknowledged at the reinstatement hearing that he had failed to disclose to clients with whom he and Wolf had entered into financial transactions that, as counsel for First Northwest as well as a shareholder in that company, applicant had personal and business interests that potentially conflicted with those of his clients and that those clients should seek independent counsel. Applicant also conceded that his misconduct had harmed his clients. Further, applicant acknowledged that he knew the relevant banking laws and that Wolf had used him to circumvent those laws. Applicant also agreed with this court's finding that applicant, "although at times semi-passive, was a willing participant in a dishonest scheme that in effect transferred a bad loan in the amount of $1.1 million from First Northwest to Columbia

---

[6] We refer to the trial panel hearing as applicant's "reinstatement hearing" throughout this opinion.

Pacific." *Griffith I*, 304 Or at 621-22. Finally, applicant stated that he could not justify the conduct that had led to his disbarment and that he "[could not] understand the contrast of why I would behave so poorly on one hand and well on another."

In October 1994, the trial panel unanimously recommended that applicant be reinstated. We have mandatory review of the trial panel's recommendation. ORS 9.539; BR 10.2. The Bar asks this court to deny reinstatement.

BR 8.1(b) provides:

"Each applicant under this rule must show that the applicant has good moral character and general fitness to practice law and that the resumption of the practice of law in this state by the applicant will not be detrimental to the administration of justice or the public interest. No applicant shall resume the practice of law in this state or active membership status unless all the requirements of this rule are met."

The trial panel concluded that applicant satisfactorily had shown that he possesses the good moral character and general fitness required to practice law and that his resumption of the practice of law would not be detrimental to the administration of justice or the public interest. We review that determination *de novo*. ORS 9.536(3); BR 10.6.

In reinstatement proceedings, the applicant has the burden of proof. Specifically, BR 8.12 provides:

"An applicant for reinstatement to the practice of law in Oregon shall have the burden of establishing by clear and convincing evidence that the applicant has the requisite good moral character and general fitness to practice law and that the applicant's resumption of the practice of law in this state will not be detrimental to the administration of justice or the public interest."

"Clear and convincing evidence means that the truth of the facts asserted is highly probable." *In re Nash*, 317 Or 354, 357, 855 P2d 1112 (1993) (internal quotation marks omitted). Any significant doubt about whether an applicant for reinstatement has sustained that burden must be resolved in

favor of protecting the public interest by denying reinstatement. *See In re Jaffee*, 319 Or 172, 177, 874 P2d 1299 (1994) (stating that rule in an original application proceeding).

■       When deciding whether an applicant for reinstatement has sustained the burden to prove that he or she is of good moral character, "[t]he question is whether *in all respects* [the applicant] is a person who possesses the sense of ethical responsibility and the maturity of character to withstand the many temptations which [the applicant] will confront in the practice of law." *In re Nash*, 317 Or at 362 (internal quotation marks omitted; emphasis in original).

■■       In considering an application for reinstatement, we also must answer the question of whether the applicant *presently* is of good moral character. *See In re Fine*, 303 Or 314, 317, 736 P2d 183 (1987) (stating that rule in an original application proceeding). Nonetheless, "[e]vidence of past acts or conduct may be relevant to that issue if rationally connected to [the] applicant's fitness to practice law." *Ibid.* In fact, when a lawyer has been disbarred for past conduct, it is very difficult for that person to prove by clear and convincing evidence that he or she is of good moral character for the purposes of reinstatement. *See In re Koken*, 214 Or 357, 361, 329 P2d 894 (1958) ("It has been recognized that stronger proof of good character is required to restore a disbarred lawyer than that required upon his [or her] admission to the Bar."). When a disbarred lawyer applies for reinstatement, the applicant must prove a reformation of character, by clear and convincing evidence, during the time between the occurrence leading to disbarment and the application for reinstatement. *See id.* at 360 (the court is "entitled to have a reasonable assurance that the misconduct which brought the petitioner before this court once before will not reoccur").

■       In a sense, a lawyer who is seeking reinstatement after disbarment must prove by clear and convincing evidence not only that he or she generally is of good moral character, but also that he or she has overcome and will not again be influenced by the specific character flaw that led to disbarment. Thus, the focus of the inquiry in a reinstatement case is on *reformation*. We acknowledge that often it will be very difficult to show that reformation, because "[r]eformation is a

very difficult matter for a petitioner to prove and for us to judge because evidence of morality is not ordinarily adducible in positive form." *In re Bernard Jolles*, 235 Or 262, 275, 383 P2d 388 (1963).

In applicant's disbarment proceeding, this court concluded that applicant was motivated by "old-fashioned greed," coupled with "blind faith in a partner whom he considered to be his friend and an expert in the financial field." *Griffith I*, 304 Or at 637-38. This court also concluded that applicant acted out of "a dishonest and selfish motive." *Id.* at 636. Thus, in this case, applicant has the burden to show that he has reformed his character by overcoming the characteristics of greed, dishonesty, and selfishness that resulted in his disbarment.

■ In determining whether an applicant has proved a reformation of character, this court looks to many different types of evidence, including: character evidence from people who know and have had the opportunity to observe the applicant; evidence of the applicant's participation in activities for the public good; evidence of the applicant's forthrightness in acknowledging earlier wrongdoing, *In re Jaffee*, 319 Or at 178; evidence of the applicant's adequate resolution of any previous substance abuse problem, *In re Rowell*, 305 Or 584, 591, 754 P2d 905 (1988); and evidence of the applicant's willingness to pay restitution to those people harmed by the applicant's earlier misconduct, *In re Graham*, 299 Or 511, 520, 703 P2d 970 (1985). Applicant presented evidence of all the types listed above.

## CHARACTER EVIDENCE

■ As mentioned above, 24 witnesses testified on applicant's behalf at his reinstatement hearing. Applicant also submitted more than 300 favorable letters and recommendations from judges, lawyers, and others, all urging that applicant be reinstated. At the outset, we note that a common theme among much of the character evidence offered in support of applicant's reinstatement was that applicant is of good moral character and that his misconduct was an isolated incident that was inconsistent with his normal good character. Many of the proponents for reinstatement who

professed applicant's excellent reputation and good moral character also had expressed that view during applicant's disbarment proceeding.

■　　References from professional and personal acquaintances often are reliable sources of evidence of an applicant's moral character. *See In re Bernard Jolles*, 235 Or at 275 (in original application proceeding, proof of reformation generally is made through testimony by those living and working with the applicant). We emphasize, however, that the focus of our inquiry is whether applicant has *reformed* the characteristics that led to his disbarment. We view with caution testimony that applicant always has had good moral character, because it contradicts the principal conclusion of this court in the disbarment proceeding and is not determinative of the question of whether applicant is likely to repeat his misconduct. Such evidence did not convince this court that it should not disbar applicant and a repeat of that evidence at the reinstatement hearing does not advance materially our inquiry about applicant's possible reformation.

However, aside from that sort of repetitive character evidence, applicant also presented evidence that does demonstrate that he has reformed his tendencies toward greed, selfishness, and dishonesty. The lawyer who supervised the FDIC litigation and the final FDIC settlement offered the most significant evidence of applicant's reformation. At the reinstatement hearing, that lawyer testified that applicant was the only lawyer out of a group of about 30 who voluntarily settled with the FDIC using his own money, before the FDIC filed a claim, rather than waiting for insurance money to cover any of his liability. The lawyer also emphasized that the voluntary and complete cooperation of applicant and one other lawyer in the FDIC litigation was absolutely instrumental to achieving the successful settlement.

Upon completion of the FDIC settlement and after applicant was disbarred, the supervising lawyer also represented applicant in two garnishment proceedings involving several First Northwest title insurance policies. At the reinstatement hearing, the lawyer testified that he was

"extremely impressed" in witnessing applicant's conduct during the five years of that litigation when contrasted against the conduct described by this court in *Griffith I*, such as applicant's willingness in the past to make false statements for his own benefit. According to the lawyer, there were "literally dozens of times" during which applicant had the opportunity to make false statements in order to gain an advantage or benefit his interests in the garnishment litigation. However, applicant continuously rejected the opportunity to engage in the same type of misconduct that this court criticized in *Griffith I*. Instead, applicant "always stuck to what [he] believed to be the absolute truth and never, under any circumstances, would go beyond it."

Additional character evidence presented at the reinstatement hearing also demonstrates that applicant took steps to reform his character. Several witnesses and letter-writers stated that, after the failure of Columbia Pacific, applicant changed his lifestyle and no longer viewed personal financial gain as a paramount concern. Further, many proponents of reinstatement thought that applicant acted admirably when he rejected several lucrative offers of employment after being disbarred and, instead, chose to work as a paralegal in the firm in which he had been a partner. Those witnesses pointed out that, as a paralegal, applicant was in daily contact with his former colleagues and was constantly reminded of his status as a disbarred lawyer. However, applicant accepted the fact that he could not practice law and worked diligently as a paralegal for his former partners and subordinates. One of applicant's former partners also testified that, through his disbarment, applicant had learned not to take the privileges and responsibilities of being a lawyer for granted.

## ACTIVITIES FOR THE PUBLIC GOOD

At his reinstatement hearing, applicant testified that he is a charter member of the Hell's Canyon Preservation Council and that he is involved in other conservation work. Applicant also presented evidence that he founded an

"over-40" soccer league for the Portland area and that he volunteered to coach and manage recreational soccer for the Portland Indoor Soccer League.[7]

Applicant also testified that he sought to do *pro bono* legal work through the Bar, which reportedly could not find an appropriate project for a disbarred lawyer. Applicant also acted as a mentor and teacher of sorts at the firm that employed him as a paralegal, discussing the pitfalls of misconduct and providing educational seminars for new lawyers in the firm on ethical trial practices and other litigation matters.

## ACKNOWLEDGMENT OF WRONGDOING

■    One of the most important aspects in addressing the question of reformation is whether the applicant has acknowledged his or her wrongdoing and has taken responsibility for his or her misconduct. *See In re Gortmaker*, 308 Or 482, 488-90, 782 P2d 421 (1989) (reinstatement denied, in part, because the applicant failed to admit his misconduct and minimized the gravity of his misconduct). At his reinstatement hearing, applicant presented evidence that he recognizes the gravity of his earlier misconduct and that he regrets the injury that he caused to many people. Applicant testified that he "fe[lt] bad" about any harm that he may have caused individual investors in First Northwest and stated that he took "full responsibility" for his misconduct. Applicant also stated that "I have friends that to this day will tell you it is all Tom Wolf's fault, and they are wrong. That's what they believe. It is my fault." Applicant further expressed that, as a result of being disbarred, "I've suffered great shame, but it is shame that is mine."

In addition, many witnesses and letter-writers emphasized that, upon his disbarment, applicant never offered any excuses for his misconduct, never tried to blame anyone else, including Wolf, for his misfortune, and never criticized the Bar, this court, or this court's opinion in *Griffith I*. One of applicant's former partners stated that applicant

---

[7] Applicant testified, however, that he was involved in soccer for his personal recreational enjoyment and did not seek out that activity as a way to help the community.

repeatedly pointed out to that partner that applicant himself had caused the problems that led to his disbarment. That same former partner also testified that, after being disbarred, applicant demonstrated a commitment to understanding all that had occurred and his role in those events. The partner testified that

> "when [applicant] got that Supreme Court opinion and he realized that people he respected had found him guilty, he began to try to really look at the whole thing and try to understand what had really happened. And that was a long, slow, painful process. He would say, Well, gosh, I can admit that, but I don't see how they could find this, and then he'd work on it and work on it. And pretty soon he'd come back and say, You know, they are right."

Finally, in his testimony before the trial panel, applicant acknowledged and agreed with the findings contained in *Griffith I*, including the conclusion that he had violated numerous disciplinary rules. Applicant also acknowledged that, during his disbarment proceeding, he did not think that he had engaged in any misconduct or illegal activities.

## RESOLUTION OF ALCOHOL AND PERSONAL PROBLEMS

During his disbarment proceeding, applicant never asserted that alcohol or any other personal problems contributed to his misconduct and, consequently, *Griffith I* contains no findings about the effects of such problems, if any existed, upon applicant's behavior. Nevertheless, evidence that those problems did exist and that applicant sought to resolve them is helpful to the question of whether applicant has taken steps to reform his character. Evidence presented at the reinstatement hearing demonstrates that, in the period of time following the failure of Columbia Pacific and continuing after his disbarment, applicant stopped drinking alcohol entirely and strengthened and improved his relationships with his wife and many of his former partners. Applicant also began paying off the enormous debt that had accumulated as a result of the failure of Columbia Pacific and eventually satisfied his personal debts.

## WILLINGNESS TO PAY RESTITUTION

■ Evidence of an applicant's attempts to compensate people who were injured by the applicant's misconduct may affect our determination of whether the applicant has reformed his or her character. *See In re Graham*, 299 Or at 520-21 (denying reinstatement, because "[t]he primary deficiency in [the] applicant's rehabilitation is his apparent lack of interest in informing himself of what money is owed to former clients and in making restitution to those former clients"). As previously noted, applicant paid, settled, or compromised all claims brought against him due to his misconduct. He also voluntarily settled his liability with the FDIC, using his own funds, before the FDIC filed an action against the parties responsible for the failure of Columbia Pacific. Finally, applicant cooperated with the FDIC and facilitated the FDIC's final settlement with all involved parties.

The Bar argues that applicant still has not made full restitution, because applicant did not affirmatively seek out other victims who did not make claims against him personally in order to apologize and to compensate those victims for their losses. Those facts are true, and we acknowledge that those actions would make a stronger case for applicant's willingness to pay restitution. However, we view the record as a whole and conclude that applicant's failure to take those steps is not the result of an unwillingness to pay restitution for his wrongs or of an unreformed, selfish moral character.

Moreover, the evidence presented at the reinstatement hearing demonstrates that the purpose of the final FDIC settlement was to satisfy all actual and potential claims arising from the failure of Columbia Pacific and that applicant's purpose in fully cooperating with the FDIC was to facilitate satisfaction of those claims. The evidence also demonstrates that the final FDIC settlement achieved the goal of satisfying all actual and potential claims; after the final settlement distributions, a residue of approximately $1 million in insurance proceeds remained. By virtue of his voluntary and forthright participation in the FDIC settlement, then, applicant did demonstrate a willingness to further the principle that all involved parties receive restitution.

## CONCLUSION

After considering the evidence presented, we conclude that applicant has proved by clear and convincing evidence that he has reformed the deficiencies in those character traits that led to his disbarment. Consequently, we find that applicant possesses the good moral character and general fitness required to practice law and that applicant's resumption of the practice of law will not be detrimental to the administration of justice or to the public interest.

Application for reinstatement granted.