Submitted on the record and Special Master's Report December 7, 1999, applicant's application for reinstatement to the Oregon State Bar denied July 21, 2000

# In the Matter of the Application for Reinstatement of

# DENI STARR,

*Applicant.*

# (OSB 94-191; SC S41967)

9 P3d 700

Deni Starr, *pro se*, filed the brief.

Lia Saroyan, Disciplinary Counsel, Lake Oswego, for the Oregon State Bar.

PER CURIAM

## PER CURIAM

■ Applicant Deni Starr was suspended from the practice of law in 1995 and again in 1998. She seeks reinstatement as an active member of the Oregon State Bar (the Bar) under Bar Rule of Procedure (BR) 8.1. She has the burden of establishing, by clear and convincing evidence, that she "has the requisite good moral character and general fitness to practice law and that [her] resumption of the practice of law in this state will not be detrimental to the administration of justice or the public interest." BR 8.12.

The Board of Governors of the Bar recommended that applicant's request for reinstatement be denied. A Special Master appointed by this court to inquire into certain factual issues also recommended against reinstatement. We have considered the Special Master's report, applicant's written objections to that report, the record of the proceedings before the Special Master, and other material submitted by applicant and the Bar. We conclude that applicant has not carried her burden of showing that she has the requisite good moral character and general fitness to practice law, and that her resumption of the practice of law will not affect adversely the administration of justice or the public interest in this state. Accordingly, we deny reinstatement.

Applicant's original suspension from the practice of law in 1995 resulted from a Bar disciplinary proceeding respecting incidents that occurred during applicant's representation of a client in a domestic relations matter. In the course of that Bar proceeding, applicant stipulated that she had: (1) disbursed funds garnished from her client's former husband to herself and to her client after agreeing with the garnishee's lawyer that she would hold the funds until the propriety of the garnishment was resolved; (2) failed to inform her client of a restraining order that required that the disputed funds be held; (3) failed to comply with multiple court orders to pay the garnished funds into court, resulting in her being held in contempt of court; (4) refused to answer a court's questions as to whom, besides her client, she had disbursed the garnished funds; and (5) refused to appear before a judge who had been assigned to the matter and, in related court appearances, had conducted herself in a threatening

and discourteous manner in her dealings with that judge. Applicant also stipulated that the foregoing conduct violated a number of disciplinary rules and agreed to an 18-month suspension from the practice of law, which began on January 1, 1995.

The Bar then initiated a second disciplinary proceeding, which was based on unrelated conduct that occurred before the original suspension. In that case, applicant, without her client's permission, had disbursed to herself part of the proceeds from two judgments in her client's favor. After hearing evidence and argument, a trial panel of the Disciplinary Board found that applicant had violated Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and other disciplinary rules pertaining to client funds, and recommended that applicant be disbarred. On *de novo* review, this court concluded that applicant had not violated DR 1-102(A)(3), but that a six-month suspension was the appropriate sanction for other charged violations that had been proved. *In re Starr*, 326 Or 328, 952 P2d 1017 (1998).

In September 1998, after both suspension periods had ended, applicant applied for reinstatement under BR 8.1. After considering her reinstatement materials, the Board of Governors recommended that the application be denied. Applicant sought review of that adverse recommendation, as provided in BR 8.8.

In its recommendation, the Bar suggested that further evidentiary development before a trial panel of the Disciplinary Board might be appropriate. *See* BR 8.8 (upon petition for Supreme Court review of adverse recommendation, "[i]f the court considers it appropriate, it may refer the petition to the Disciplinary Board to inquire into the applicant's moral character and general fitness to practice law"). This court chose, instead, to appoint a Special Master to conduct an inquiry into three areas of concern identified by the Bar.[1]

---

[1] The Bar identified seven such areas: (1) applicant's history of repeated serious violations; (2) applicant's seeming failure to recognize her past actions as wrong; (3) the weakness of applicant's character references; (4) applicant's lack of candor about her suspension to those who employed her after her suspension;

The court directed the Special Master to report his findings and conclusions with respect to those concerns, as well as to the ultimate question raised in this proceeding.

After receiving evidence, the Special Master submitted a report containing his findings with respect to the three concerns that this court had identified—whether applicant recognized her wrongdoing, whether she had been candid with employers during her suspension, and her fitness in other respects. The Special Master concluded that applicant had failed to make the showing of moral character, professional fitness, and lack of detriment to the justice system and the public that is required before an applicant may be reinstated under BR 8.1. He further concluded that she had failed to show that "she ha[d] been able to effectuate a change in the type of conduct that caused her to be suspended." The matter now is before us for final disposition.

■ As noted, an applicant for reinstatement has the burden under BR 8.12 of showing by "clear and convincing evidence" that

> "the applicant has the requisite good moral character and general fitness to practice law and that the applicant's resumption of the practice of law in this state will not be detrimental to the administration of justice or the public interest."

Under the foregoing standard, the evidence must persuade us that it is highly probable that applicant meets the criteria for reinstatement. Any substantial doubts about an applicant's character must be resolved in favor of protecting the public by denying the application for reinstatement. *In re Griffith*, 323 Or 99, 105-06, 913 P2d 695 (1996).

■ Before we turn to the merits of the case, we first address two evidentiary concerns that applicant raised in her response to the Special Master's recommendation. Applicant

---

(5) applicant's lack of cooperation with the Bar; (6) applicant's continuing litigiousness; and (7) applicant's fitness in other respects, particularly with respect to her psychological and emotional state. This court concluded that the existing record was sufficient with respect to four of those concerns—applicant's history of violations, the quality of her character references, her level of cooperation with the Bar, and her litigiousness—but asked the Special Master to develop the record further with respect to the remaining concerns.

first contends that the Special Master erred in compelling the production of her therapist's treatment records, because those records are privileged under OEC 504, the evidentiary rule containing to the psychotherapist-patient privilege. The Special Master ordered the production of the records after he concluded that applicant had waived her privilege. *See* OEC 504(4)(b)(A) (no privilege where patient relies on particular condition as element of patient's claim or defense). Applicant contends that she did not make her emotional state an element of her claim or defense.

We do not agree with that assessment. After she applied for reinstatement, applicant received a letter from the Bar disciplinary office that suggested that applicant might wish to supplement her application file to address concerns about how she was addressing personal and emotional problems that had been alluded to in her disciplinary proceedings and in her application materials. The letter suggested that applicant might wish to identify any therapists whom she had consulted in recent years about problems that could affect her ability to practice law and to indicate whether she would permit those therapists to release her treatment records or discuss her case. Thereafter, applicant submitted supplemental information in support of her reinstatement application. In a section of that material devoted to the issue of rehabilitation, she wrote that

"[m]ost * * * of [applicant's] work on rehabilitation has come through regular psychotherapy with a psychologist whom [applicant] began seeing regularly after the adverse decision by the trial panel. [Applicant] * * * felt it important to address the issues that had resulted in the disciplinary hearings."

Applicant appended a record showing the dates of her office appointments with her therapist. Applicant also submitted an evaluation by a psychologist who never had treated her, but who based his evaluation on a personal interview, a review of the decisions in applicant's disciplinary proceedings, and the results of a standard psychological test. Applicant did not agree to the release of her therapist's records; neither did she agree to an independent psychological evaluation that the Bar had sought.

Applicant contends that she submitted the psychological materials "in the spirit of cooperation," not to show that there had been an improvement in her psychological condition. She contends that she never has argued that her past behavior resulted from emotional problems, but only that that behavior surfaced at a time when she was under a great deal of stress. In short, she argues that OEC 504(4)(b)(A) does not apply because she did not make her emotional state an element of her case.

Regardless of the label that applicant attached to her problems, she clearly indicated in her submissions to the Bar that there was an emotional component to her past conduct that she was addressing through psychotherapy. The fact that applicant submitted her therapist's appointment calendar and other psychological materials leads to the reasonable inference that she wished to create the impression that she had dealt with the emotional problems using that therapeutic approach. Although the Bar may have encouraged her to do so, it was applicant's choice to interject her psychological condition and treatment into the inquiry— most likely because she understood that it was an important, perhaps critical, issue to the Bar and that ignoring it would not serve her cause. And, once applicant raised the issue as pertinent to her claim that she now is entitled to reinstatement, she waived the privilege that ordinarily would apply to her communications with that psychotherapist.

■       Applicant also objects to the Special Master's decision to admit certain documents pertaining to applicant's malpractice action against the lawyer who had represented her in her second disciplinary proceeding. Applicant argues that the documents were not offered in a timely manner, in that they were not submitted with the Bar's pretrial statement and were not turned over to applicant by September 20, 1999, the designated date for such disclosure.

In the order referring this matter to the Special Master, this court provided a strict time line for the proceedings. The order included the following provision:

"On or before September 20, 1999, each party shall provide the special master with and serve on the other party * * * copies of any documentary evidence, including affidavits,

that the party intends to offer at the hearing. A witness or document not identified properly in the foregoing submissions shall not be considered at the hearing."

Applicant asserts that the Bar never served her with copies of the documents at issue and that it did not submit the materials to the Special Master until the date of the hearing. Although the validity of that assertion cannot be ascertained clearly from the record, we do note that applicant objected to the admission of the documents on the ground of untimeliness, that the objection was overruled without explanation, and that the Bar has not responded to applicant's claim of untimeliness. Given those facts, we think that the best solution is to omit the documents from the scope of our review. We note, however, that applicant discussed her malpractice action against her former lawyer at length in her own testimony and that she has not argued that we should not consider that testimony.

■　　　Turning to the merits, the Bar in its adverse recommendation to this court identified seven "issues of concern" regarding applicant's qualification for reinstatement. We address each of those concerns in turn, some more extensively than others.

## DISCIPLINARY HISTORY

■　　　The Bar argues that, although applicant already has served the terms of suspension for her past violations of the disciplinary rules, her entire disciplinary record is relevant in evaluating whether she has the requisite moral character and fitness to practice law.

■■　　　We agree. In all reinstatement cases, it is the applicant's present character and fitness that is at issue. However, past acts or conduct rationally may be connected to that issue, *In re Fine*, 303 Or 314, 317, 736 P2d 183 (1987), and usually will be relevant when an applicant seeks reinstatement after a disciplinary suspension. In such cases, the past conduct that led to the suspension is important because, in addition to the ordinary burden of showing present good character and fitness, this court must be satisfied specifically that the applicant "will not again be influenced by the specific character flaw" that led to suspension, *i.e.*, that there has

been meaningful character reformation. *See Griffith*, 323 Or at 106 (so stating with respect to application for reinstatement under former rule permitting reinstatement after disbarment). We already have described applicant's disciplinary history, which includes serious disciplinary rule violations.

## RECOGNITION OF WRONGDOING AND REMORSE

■ ■ Applicant has the burden of showing that she has reformed herself respecting the type of conduct that led to her suspension. One of the most important questions in measuring reformation is whether an applicant acknowledges past wrongdoing and takes responsibility for that misconduct. *Griffith*, 323 Or at 110. In this proceeding, the Bar found little, if any, evidence in the application for reinstatement or in applicant's own testimony that suggested that applicant either acknowledged her past acts as wrongdoing or took responsibility for those acts. We referred the issue to the Special Master, whose findings on this point were mixed. The Special Master found, for example, that applicant sincerely regretted her earlier misconduct, but he also found that applicant continues to blame others for her disciplinary problems. Based on our own review of the record, we agree with the Special Master's mixed appraisal.

## CHARACTER EVIDENCE

■ We have recognized that personal and professional references are important and often reliable sources of evidence of an applicant's moral character. *Griffith*, 323 Or at 108. The Bar contends that applicant's submissions in that regard are unpersuasive. We agree.

■ As part of her application for reinstatement, applicant was required to submit five formal character questionnaires that had been completed by persons who were able to provide a "factual, accurate and reliable appraisal of [her] character." Applicant submitted the required questionnaires and also submitted several informal letters of support from friends and former clients. The informal letters of support present a uniformly positive picture of applicant as a caring person who is deeply committed to social justice and who recently has learned to deal more effectively with the emotional outfall of that level of commitment. The responses to

the formal questionnaires, on the other hand, were mixed, with two of the five respondents indicating that they were unable to give a factually accurate and reliable appraisal of applicant's character, because they had had little contact with her in recent times or considered themselves to be inadequately informed. Taken as a whole, applicant's character evidence does not help persuade us that applicant meets the criteria for reinstatement.

## COOPERATION WITH THE BAR

In its adverse recommendation, the Bar asserted that applicant had failed to cooperate fully with its investigation and that it viewed that failure "as further evidence of [applicant's] poor judgment." Applicant responded that her responses to the Bar's requests were reasonable under the circumstances and that her refusal to accede to the Bar's demands should be assessed in light of this court's decision in *In re Jolles*, 235 Or 262, 383 P2d 388 (1963), discussed *post*.

This is an application for reinstatement in which failure to cooperate with the Bar disciplinary counsel's office in its investigation of the application is not, in itself, a basis for concluding that the applicant lacks the requisite good moral character and general professional fitness that is required. It is not a disciplinary proceeding, in which applicant could be charged for violating a disciplinary rule if she failed to cooperate with the Bar's investigation. *See* DR 1-103(C) (lawyer who is subject of disciplinary investigation shall comply with reasonable requests of authority empowered to investigate). However, a failure to cooperate might reflect a trait or mindset that is relevant, such as a persistent, even reckless, lack of professionalism or a failure to acknowledge prior wrongdoing. More importantly, a failure to cooperate with the Bar could result—as it has here—in a less-than-complete record with respect to relevant questions about the applicant's character and fitness. Because the Bar is charged with investigating reinstatement applications for the purpose of making a recommendation to this court, BR 8.1, and because the applicant bears the burden of proof with respect to showing his or her fitness, BR 8.12, we expect applicants for reinstatement to make every effort to cooperate with the Bar's reasonable requests and to be prepared to accept the evidentiary implications of any failure to do so.

■ Our review of the record shows that applicant was less than fully cooperative with the Bar in two respects: (1) she refused to meet with disciplinary office staff at the Bar office to discuss her reinstatement application; and (2) she declined to submit to an independent psychological evaluation. The latter point concerns us, because it leaves a gap in the evidence on a relevant question, *viz.*, whether applicant has dealt with the emotional problems that apparently were associated with her earlier misconduct.[2]

Applicant's failure to cooperate with the Bar's request for a personal interview is more troubling. We note that applicant's correspondence with the Bar demonstrates antagonism toward the disciplinary counsel's office as well as an equivocal attitude about her own culpability in the matters that led to her suspension. Applicant's refusal to attend a personal interview is another manifestation of that mind-set. We reach that conclusion not only because of the patent reasonableness of the Bar's request, but also because of applicant's unprofessional and defiant stance in refusing.[3]

Applicant contends that her refusal was reasonable and that it was the Bar that was unreasonable in refusing to accede to her offer of a compromise: (1) to meet in a neutral setting; (2) to exclude certain members of the disciplinary office from attending; and (3) to limit the interview to questions that would be presented to applicant in writing prior to the interview. Applicant notes that, in *Jolles*, 235 Or at 276-77, this court approved the application of an applicant who had refused to disclose certain information to the Bar, but who had offered a compromise that the Bar had rejected.

Applicant's effort to compare her case to *Jolles* is not apt. In *Jolles*, this court concluded that the applicant's reasons for refusing to disclose information to the Bar—that he

[2] We agree with the Special Master that the expert opinions that are in the record are unpersuasive with respect to that issue, because the experts were not able to conduct a meaningful examination of applicant.

[3] Perhaps the starkest example of applicant's position is in applicant's response to a letter written by Mark Johnson, who was president of the Bar at the time, asking applicant to attend an interview that a member of the Bar disciplinary counsel's office had requested. Applicant wrote: "Yes, I know that [Bar counsel] claims to want to interview me, but that does not allow me to interview her."

was afraid that such disclosure would harm his former associates—were sincere and selfless, and that the applicant demonstrated his sincerity by his efforts to arrange a compromise that would provide the desired information without causing harm. *Id.* Applicant's claimed reasons for not wanting to attend the requested interview—that she found the Bar offices and some members of the Bar staff to be intimidating and wanted to ensure the accuracy of her statements—are not comparable.

## CANDOR WITH EMPLOYERS

■ In its adverse recommendation on her application, the Bar asserted that applicant had performed legal research and paralegal services for other lawyers during the period of her suspension, and that some of those employers had reported to the Bar that applicant had not been candid about her disciplinary status when she applied for employment. This court referred that issue to the Special Master for further factual development. The Special Master found that applicant had not disclosed her suspended status to some prospective legal employers and that legal employers generally expect lawyer-applicants for nonlawyer positions to disclose the fact of suspension from the Bar. The Special Master concluded that applicant's failure to disclose her suspended status showed a lack of candor that is unacceptable for a lawyer.

■ Lawyers who have been suspended from the practice of law may not practice law during the period of their suspension. BR 6.3. Suspended lawyers also must refrain from conduct that conveys an impression that they are qualified to practice law. *See, e.g., In re Kraus*, 295 Or 743, 752-53, 670 P2d 1012 (1983) (continued use of law office, retention of sign identifying oneself as an attorney, and continued use of business listing in telephone directory might violate required standard of conduct during suspension). Subject to those two prohibitions, however, suspended lawyers may seek and accept employment with law firms and other legal employers. For obvious reasons, doing so may require a lawyer who is suspended from practice to navigate some difficult terrain.

Since her suspension, applicant has worked for a number of lawyers. The record shows that applicant was honest about the fact of her suspension with some of those employers, thereby avoiding any concern about conveying the impression that she still was qualified to practice law. However, the record also shows that, at other times, applicant was less forthright. For example, during her suspension, she applied to be a contract lawyer. The lawyer who advertised the position ultimately hired her. That lawyer testified at the hearing before the Special Master about the circumstances surrounding applicant's employment. He testified that applicant did not disclose to him at the time of the interview or at any time during her employment that she was suspended. He also testified that, at the time he hired applicant, he needed someone who could perform "the full range of legal work involved" and that he was under the impression that applicant was a contract lawyer, *i.e.*, fully licensed to practice law. The lawyer related that, after applicant had been working in his office for a short while, he asked her to argue a motion and was upset when she told him that she could not appear in court because she had not paid her malpractice insurance. The lawyer told applicant that he would not continue to pay her the agreed-upon rate of $50 per hour if she were unable to do all the work that was expected and that he would reduce her compensation to that of a legal assistant clerk—$30 per hour—unless she agreed to take care of her insurance problem. Applicant opted for the reduced rate without ever disclosing to the lawyer that she was under suspension.

Also during her suspension, applicant identified herself to a prospective employer on at least one occasion as a "contract lawyer" without also disclosing that she was at that time suspended. Specifically, she responded to an advertisement for a paralegal position (which clearly did not involve the practice of law), by submitting a resume that identified herself as a "J.D." and a "Contract Lawyer," and by enclosing a cover letter that stated that she was a "former litigator currently doing contract work on an ad hoc basis." The resume indicated that applicant's membership in the Bar was "currently inactive." Applicant did not disclose the fact of her suspension when she was interviewed for the job. She was hired.

The lawyer who hired her testified before the Special Master that he was surprised when he later learned that applicant had been suspended, and he felt that he had been misled.

In her own testimony, applicant asserted that her conduct in the foregoing circumstances was not deceptive. She explained that, despite her suspension, she is still a J.D. and a lawyer. Applicant also asserted that identifying herself as a "contract lawyer" on a resume or otherwise would not or should not imply that she was practicing law. Applicant also argued that, in employment interviews, her obligation of candor would be satisfied if she answered the employer's questions honestly and volunteered any adverse information that was relevant to the work that she would be asked to perform. Applicant indicated that her contact with employers should not be a cause for concern because, in every circumstance in which she had omitted any mention of her suspension, she had determined that the fact of her suspension was not relevant to the work that she would be required to do.

Applicant's views about the limits of her duty of candor are startling. First, applicant incorrectly suggests that identifying herself as a "contract lawyer," either by including that designation on her resume or by answering a job listing for a contract lawyer, does not convey the implication that she presently is qualified to practice law. Although it is true that contract lawyers often perform work that is not, strictly speaking, the practice of law, the use of the title in the context of an application for legal employment clearly implies a present qualification to practice.

Neither does it matter that applicant claims to have felt assured that the work for which she was applying would not involve the actual practice of law. When applicant styled herself as a contract lawyer in response to an advertisement for paralegal help, she was setting herself apart from other paralegal applicants, and she was inviting the employer to select her on that basis. Whether or not the employer actually based its hiring decision on her self-designation, applicant was not candid when she described herself in terms that implied that she was qualified to practice law.

It seems clear, moreover, that, in at least one of the incidents described above, the employer actually was seeking

to employ someone who could practice law and that applicant only was hoping or gambling that she would not be asked to cross that line. Her gamble did not pay off, and the employer was left in the lurch—at least, he did not obtain the employee for whom he thought that he had bargained. Under the circumstances, applicant knew or should have known that the fact of her suspension probably would make a difference to the employer, and her failure to volunteer information about it reflects a lack of candor.

## FITNESS IN OTHER RESPECTS

The Bar raised one final concern in its recommendation against applicant's reinstatement, focusing on whether applicant has resolved certain personal and emotional problems that purportedly have caused her to behave inappropriately in the past.

The record shows that much of applicant's past misconduct is marked by a common theme of uncontrolled and inappropriate combativeness. Without a reliable, independent assessment of her emotional status at this time, this court is unable to determine whether applicant has resolved that problem. Should she seek reinstatement in the future, the applicant may need to address this.

For the foregoing reasons, we hold that applicant has not carried her burden of showing, by clear and convincing evidence, that she has the requisite good moral character and fitness to practice law, and that her resumption of the practice of law will not be a detriment to the public or to the administration of justice in this state.

## DISPOSITIONAL OPTIONS

Applicant suggests that, if we are unwilling to approve her application unconditionally, then we should consider the option of reinstating her with conditions. She suggests the following conditions: (1) that she continue to work with the Oregon Attorney Assistance Program; (2) that she continue to work with a mentor; and (3) that she not violate the Code of Professional Responsibility for two years.

This court rejected a similar request for conditional reinstatement in *In re Gortmaker*, 308 Or 482, 494-95, 782

P2d 421 (1989), reasoning that, if clear and convincing evidence of an applicant's good moral character is lacking, then an application for reinstatement should be denied outright. We find nothing in the facts of the present case that persuades us that applicant's request for conditional reinstatement should be treated differently.

Applicant argues in the alternative that, if we are unwilling to approve her application on the record that is before us, then we must refer the matter to the Disciplinary Board for a hearing under BR 8.8. Applicant contends that she has a due process right to a hearing before the Disciplinary Board and that the use of a Special Master to develop the record cannot substitute for the referral procedure that is provided in the Bar Rules of Procedure.

Applicant appears to believe that all lawyers whose applications for reinstatement are denied by the Bar are entitled to a trial panel proceeding under BR 8.8. That belief is unfounded. BR 8.8 provides for Supreme Court review of an adverse recommendation on a reinstatement application. It further provides that this court "may" refer the petition for review of an adverse recommendation to the Disciplinary Board, *"if the court considers it appropriate."* (Emphasis added.) BR 8.8 contemplates that, in some circumstances, this court will conclude that a referral to the Disciplinary Board is not appropriate. That rule does not require a Disciplinary Board proceeding in those circumstances.

We do not deny that applicant has an interest in regaining her ability to practice law or that she has a right to an appropriate level of process before her bid for reinstatement can be denied. *See In re Nash*, 317 Or 354, 364, 855 P2d 1112 (1993) (noting, in review of reinstatement proceeding, that United States Supreme Court has held that state cannot exclude a person from the practice of law in a manner that contravenes due process). We are satisfied, however, that the choice to refer the matter to a Special Master for a hearing and recommendation was appropriate and that applicant has received the process to which she is entitled. Accordingly, we reject her argument that this matter should be referred to the Disciplinary Board.

## CONCLUSION

Applicant has not established by clear and convincing evidence that she has the requisite good moral character and general fitness to practice law, and that her resumption of the practice of law will not be detrimental to the administration of justice or the public interest.

Applicant's application for reinstatement to the Oregon State Bar is denied.